**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 08-cv-01071-CMA-KMT

BELLCO CREDIT UNION,

      Plaintiff,

v.

THE UNITED STATES OF AMERICA,

      Defendant.

---

## ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

---

This matter is before the Court on Plaintiff Bellco Credit Union's Motion for

Summary Judgment (Doc. # 62) and the United States' Motion for Summary Judgment

(Doc. # 69). For the following reasons, the motions are GRANTED in part and DENIED

in part. While certain issues involve undisputed facts capable of resolution on summary

judgment, other issues must await fuller exposition at trial.

## <u>INTRODUCTION</u>

Bellco is a credit union that, in addition to providing basic banking services, offers

certain insurance and financial services products to its members. This case involves a

dispute over whether the income earned from those products is taxable. As a tax-

exempt organization, Bellco is liable only if all or part of this income qualifies as

"unrelated business income" under the tax code. The code provides little guidance on

precisely what is or is not "related," directing instead that the determination be made in

light of all the facts and circumstances.  Perhaps as a result of this standard, the parties

have filed substantial cross-motions for summary judgment, debating the nature of the

facts and the conclusions to be drawn therefrom.  Both motions are fully briefed and ripe

for decision.

## BACKGROUND

### I.    FACTUAL BACKGROUND

Bellco is a Colorado state-chartered credit union, owned and governed by its

members.  (Doc. # 62 at 2, ¶ 1, and 4 ¶¶ 9-10; Doc. # 83 at 1 ¶ 1, and 2 ¶¶ 9-10).

In Colorado, credit unions are cooperative associations that exist for the two-fold

purpose of promoting thrift among their members and providing them a source of fair

and reasonable credit.  (Doc. # 62 at 4, ¶ 6; Doc. # 83 at 1, ¶ 6).  *See also* Colo. Rev.

Stat. § 11-30-101(1)(a).  Credit unions also seek to promote financial literacy in their

membership.  (Doc. # 62 at 4, ¶ 7; Doc. # 83 at 2, ¶ 7).

As a state-chartered credit union, Bellco is generally exempt from federal income

tax.  (Doc. # 69 at 3, ¶ 1; Doc. # 81 at 4, ¶ 1).  *See also* 26 U.S.C. § 501(c)(14)(A).

However, like most exempt organizations, Bellco is subject to the so-called "unrelated

business income tax" ("UBIT").  This lawsuit involves several types of products offered

by Bellco, the income from which the Government contends is taxable unrelated

business income.  Those products are: credit life and disability insurance; financial

services products; and accidental death and dismemberment insurance.

2

As is obvious from the name, UBIT applies only to income from "unrelated" business – that is, business not "substantially related" to Bellco's tax-exempt purpose. *See* 26 U.S.C. §§ 511-513.  Bellco argues that two of the products – credit insurance and financial services – fit this "substantial relation" description and thus should not be taxed.  Bellco's argument on the third product is different.  The tax code expressly excludes "royalties" from the UBIT calculation.  26 U.S.C. § 512(b)(2).  Bellco argues that income from AD&D insurance was "royalties," and therefore also not taxable. The resolution of both issues depends on an evaluation of the relevant "facts and circumstances" surrounding each product.  *See* 26 C.F.R. §§ 1.512(b)-1; 1.513-1(d)(2).[1]

### A.    Credit Insurance

When Bellco members took out a loan, they were offered the option to purchase credit life and credit disability insurance on that loan.  Credit insurance provides protection in the event a borrower dies or becomes disabled while the loan is outstanding.  (Doc. # 62 at 6, ¶ 20, and 8, ¶ 30; Doc. #83 at 3, ¶ 20, and 5, ¶ 30). The rate Bellco charged its members for credit life insurance was the lowest in Colorado – 39 cents per $1,000 of coverage, as compared with 58 cents per $1,000 that Colorado banks were allowed to charge for the same protection.  (Doc. # 62 at 7, ¶ 27; Doc. # 83 at 5, ¶ 27).  For the years at issue in this lawsuit, Bellco's average "loss ratio" – the amount collected in premiums as compared to the amount paid out in claims – was

---

[1]  In July 2003, Bellco merged with a separate credit union – First Choice Credit Union. (Doc. # 69 at 5-6, ¶ 7; Doc. # 81 at 5, ¶ 7).  Because of the way this merger was accounted for, some of the income at issue in this case was actually earned by First Choice.  (*Id.*).  The Court discusses the import of this fact later in this Order.

30.3%, meaning that Bellco paid out $0.30 for every $1 collected.  (Doc. # 69 at 8, ¶ 15; Doc. # 81 at 8, ¶ 15).

Bellco received credit insurance income from three specific sources.  The majority of the income came from insurance sold on "direct" loans.  (Doc. # 69 at 7, ¶ 10; Doc. # 81 at 6, ¶ 10).  These loans were initiated by Bellco employees themselves and the insurance was provided by a company called Minnesota Life.  (*Id.*).  The insurance premiums were so-called "declining balance" premiums, which meant that the required premium payment decreased as the loan balance declined.  (Doc. # 62 at 7, ¶¶ 24-25; Doc. # 83 at 4-5, ¶¶ 24-25).

Bellco also sold credit insurance through an "indirect" lending program with automobile dealerships.  The program was managed by a group called CUILA, which was formed by Bellco and numerous other credit unions and in which Bellco held approximately a one-third ownership stake.[2]  (Doc. # 69 at 10, ¶ 21; Doc. # 81 at 10, ¶ 21; *see also* Doc. # 67, Ex. I at 20:3-10.)  Through this indirect lending program, dealership employees offered automobile purchasers financing options from over forty credit unions, including Bellco.  (Doc. # 69 at 10, ¶¶ 21, 23; Doc. # 81 at 10, ¶¶ 21, 23).  Although Bellco provided the initial parameters for the loans, the loan process, including the sale of products such as credit insurance, was conducted by dealership employees.  (Doc. # 69 at 10, ¶ 23; Doc. # 81 at 10, ¶ 23).  Unlike the direct loan insurance monthly

_____

[2]  According to the deposition of Doug Ferraro, president and CEO of Bellco, Bellco's ownership interest was 38 percent.  (Doc. # 67, Ex. I at 20:3-10.)  However, at the hearing on the parties' motions for summary judgment, Bellco's counsel claimed a 37 percent interest.  This difference is immaterial to the Court's analysis.

4

declining premiums, indirect loan insurance was a "single premium" product, meaning that borrowers made one lump sum payment when the loan was initiated.  (Doc. # 69 at 11, ¶ 24; Doc. #81 at 10, ¶ 24).  Bellco received a 4.5% commission on the loan insurance premiums paid for through the indirect lending program.  (*Id.*).

Finally, given its ownership interest in CUILA, Bellco was paid a share of CUILA's net income from its overall sales of credit insurance.  (Doc. # 91 at 10, ¶ 26).  CUILA's income included commissions paid for credit insurance policies sold to individuals who were not Bellco members.  (*Id.*).

B.    **Financial Services**

The second general product at issue is financial products and services.  Bellco is not a licensed securities broker-dealer and is, therefore, legally prohibited from offering certain financial products and services to its members.  (Doc. # 62 at 14-15, ¶¶ 65-68; Doc. # 83 at 12, ¶¶ 65-68; *see also* Doc. # 69 at 12, ¶ 29; Doc. # 81 at 10, ¶ 29).  As a result, it partnered with CUSO Financial Services ("CFS"), a broker-dealer dedicated to providing financial services to credit unions.  (Doc. # 62 at 14-15, ¶¶ 65-68; Doc. # 83 at 12, ¶¶ 65-68).  Bellco had no direct involvement in the sale of these financial products and services, but instead permitted CFS representatives to set up in Bellco's major branches and referred Bellco members to those representatives when appropriate.  (Doc. # 62 at 15, ¶ 70; Doc. # 83 at 12, ¶ 70; *see also* Doc. # 69 at 12, ¶ 29; Doc. # 81 at 10, ¶ 29).  The representatives were not Bellco employees, but rather self-employed

5

independent contractors supervised by CFS.  (Doc. # 69 at 12, ¶ 28; Doc. # 81 at 10, ¶ 28).

CFS representatives offered Bellco members a wide range of financial products, such as stocks, bonds, mutual funds, and annuities.  (Doc. # 62 at 14, ¶ 65; Doc. # 83 at 12, ¶ 65).  Not only were these financial products made available to Bellco's members, but also, pursuant to the Bellco/CFS agreement, CFS representatives were allowed to offer products and services to non-members.  (Doc. # 69 at 13, ¶ 31; Doc. # 81 at 10-11, ¶ 31).  During the tax years in question, a relatively small percentage of the products sold – in the range of 10% – were sold to non-members.  (Doc. # 91 at 11, ¶ 31).  CFS also trained Bellco employees on how these financial products and services were a means for the credit union to achieve its goal of helping its members toward financial independence.  (Doc. # 62 at 15, ¶ 71; Doc. # 83 at 12, ¶ 71).  CFS representatives assisted Bellco members in financial planning, regardless of their investment potential, and invited Bellco members to an on-going series of free financial planning seminars.  (Doc. # 62 at 15-16, ¶¶ 71, 73; Doc. # 83 at 12-13, ¶¶ 71, 73).

The majority of Bellco's financial services income came from commissions on CFS's sale of these financial products.  Specifically, whenever a product was sold, the wholesaler of the product paid CFS a commission, 40-45% of which CFS distributed to Bellco.  (Doc. # 69 at 13, ¶ 30; Doc. # 81 at 10, ¶ 30).  As noted above, CFS sold to Bellco members and non-members; as a result, Bellco's income from these financial products and services includes commissions on sales to non-members.  (Doc. # 69 at 13, ¶ 31; Doc. # 81 at 10-11, ¶ 31).

Bellco's financial services income also included its share of the profits of a company called Member Gateways.  As characterized by the parties, Member Gateways was created by a conglomeration of credit unions, including Bellco, for the purposes of evaluating new products for members and creating economies of scale in the acquisition of those products.  (Doc. # 69 at 13, ¶ 32; Doc. # 81 at 11, ¶ 32).  Bellco had a 4% ownership interest in Member Gateways; Member Gateways in turn invested in CFS.  (*Id.*)

### C.    Accidental Death & Dismemberment Insurance

The final product at issue in this lawsuit is accidental death and dismemberment ("AD&D") insurance.  Bellco, in conjunction with a third party, Affinion Benefits Group,[3] offered AD&D to its members.  (Doc. # 62 at 11, ¶ 44; Doc. # 69 at 14, ¶ 33).  The Bellco/Affinion relationship is memorialized in two joint marketing agreements, signed in 1998 and 2002, respectively.  (Doc. # 69 at 14, ¶ 33; Doc. # 81 at 11, ¶ 33).  These agreements describe the parties' general obligations.  Affinion agreed to direct the marketing of AD&D to Bellco's members, including sending direct mail solicitations. (Doc. # 67, Exs. L-34, L-36).  Bellco agreed to provide its membership information, to provide relevant marketing information, and to "[a]uthorize and coordinate" certain mailings.  (*Id.*)

---

[3] Affinion has been known by several different names, including FISI Madison, the name used by the Government in its briefs.  For consistency, the Court will refer to this entity as Affinion.

Prior to each solicitation, Bellco reviewed, edited, and approved the materials, which included a letter from Bellco's CEO. (Doc. # 69 at 16, ¶¶ 43, 45; Doc. # 81 at 12-13, ¶¶ 43, 45). Based on criteria established by Affinion, Bellco also created lists of its members to whom the solicitation was to be sent. (Doc. # 69 at 16, ¶ 42; Doc. # 81 at 12, ¶ 42). Affinion did the actual mailing, contracting with a third party vendor to scrub the Bellco member list to comply with privacy rules. (Doc. # 62 at 11, ¶¶ 46-47; Doc. # 83 at 9, ¶¶ 46-47). Affinion paid for the mailing and necessary promotional materials. (Doc. # 62 at 12, ¶ 49; Doc. # 83 at 9, ¶ 49). If members had questions about AD&D, they would typically call Affinion, whose phone number was listed on the materials. (Doc. # 62 at 13, ¶¶ 57-58; Doc. # 83 at 11, ¶¶ 57-58). While Bellco call center employees would respond to member inquiries concerning AD&D on a superficial level, Affinion asked Bellco to forward all substantive inquiries to them. (Doc. # 62 at 13, ¶ 58; Doc. # 83 at 11, ¶ 58).

Two levels of AD&D were offered to Bellco members. Any Bellco member could receive up to $1,000 of coverage at no cost to them, because Bellco would pay the premium. (Doc. # 62 at 11, ¶ 45; Doc. # 83 at 9, ¶ 45). Bellco members could also apply for additional levels of coverage. Affinion would process the Bellco member's application for coverage and decide whether to issue coverage. (Doc. # 62 at 12, ¶¶ 52-53; Doc. # 83 at 10, ¶¶ 52-53). There is some dispute over precisely how member premiums were collected, (*compare* Doc. # 62 at 12, ¶ 54 *with* Doc. # 83 at 10-11, ¶ 54), but it is undisputed that Bellco members could authorize a debit to pay

8

the premiums directly from their Bellco accounts. (Doc. # 62 at 12-13, ¶ 55; Doc. # 83 at 11, ¶ 55). Bellco had no involvement in setting the premium amounts. (Doc. # 62 at 12, ¶ 54; Doc. # 83 at 11, ¶ 54). And Affinion, not Bellco, processed the actual claims for AD&D. (Doc. # 62 at 13, ¶ 56; Doc. # 83 at 11, ¶ 56).

Pursuant to the 2002 marketing agreement, Bellco received two forms of compensation: an "administrative allowance" for "marketing and administrative functions performed under" the agreement; and a "marketing bonus" paid "[i]n consideration of [Bellco's] authorization and coordination with" Affinion on the so-called "Recent Mailing Event," defined in the agreement as the most recent mail solicitation. (Doc. # 67, Ex. L-36). The 2002 agreement provided that the administrative allowance equaled 30% of the premiums collected from members who had elected to receive more than the $1,000 in "free" coverage. (*Id.*). The agreement did not, however, specify any calculation method for the marketing bonus, but rather simply provided the bonus would be paid "as mutually agreed upon by the parties." (*Id.*) It appears that Bellco received a total of $275,000 in marketing bonus payments in the years 2000, 2001, and 2002. (*See* Doc. # 67, Ex. Q-121). Testimony from Bellco's director of finance, Carol Koth, indicates that these payments were amortized over the five-year period from 2000 to 2005. (Doc. # 67, Ex. B at 49:1-13). In 2003, the only tax year in which income from the Bellco/Affinion relationship was reported, Bellco received somewhere between

9

$150,000 and $200,000 in income in the form of an administrative allowance.[4] (*See* Doc. # 67, Ex. A; Ex. Q-121).

Bellco's total reported AD&D income for 2003 was $200,220. (Doc. # 67, Ex. A at 18 of 22). Although the parties present vastly different characterizations of Bellco's involvement, it is undisputed that Bellco employees devoted an estimated 683 hours to the AD&D program in 2003, incurring $32,413 of expenses. (Doc. # 69 at 15, ¶¶ 39-40; Doc. # 81 at 12, ¶¶ 39-40; Doc. # 91 at 3, ¶ 3). Bellco contends that this is equal to only one-tenth of 1% of Bellco's total employee time for 2003.

## II.    PROCEDURAL BACKGROUND

After Bellco had filed its 2006 taxes, the IRS issued guidance that certain credit union activities generated income subject to UBIT. (Doc. # 14 at 5, ¶ 5). In response, Bellco filed its exempt organization business income tax returns for tax years 2000 through 2006. With these returns, Bellco paid the taxes the IRS contended was due, along with interest and penalties, for tax years 2000, 2001, and 2003 – the only years for which Bellco had UBIT liability. (*Id.* at 5-7, ¶¶ 6-8, 11-12, 15-16). Bellco then filed suit seeking a refund of these payments.[5]

---

[4] Although not entirely clear, it appears from the record that: $925 of the year 2003 income was actually earned by First Choice, with which Bellco later merged, *see infra* n.1; approximately $150,000 was the administrative allowance; and the remaining approximately $50,000 was the amortized portion of the marketing bonus payments. (Doc. # 67, Ex. B at 48:15-49:13).

[5] The pleadings suggest that Bellco had initially determined it generated no taxable business income and thus had not filed tax returns at the time they would traditionally have been due. Instead, on August 15, 2007 – following the IRS's guidance on credit union UBIT – Bellco for the first time filed its returns, paid its taxes and penalties, and then initiated this refund suit. (*See* Doc. # 1, ¶¶ 13-14, 21-22, 31-32).

Bellco contends that this suit is one of two "test cases" challenging what Bellco describes as the IRS's change in position on credit union UBIT.  (Doc. # 62 at 28). Bellco identifies *Community First Credit Union v. United States*, 08-C-57 (E.D. Wisc.), as the other.  In that case, after a four-day jury trial, the credit union prevailed on its claim that the income from certain insurance it sold – credit life and disability insurance and "guaranteed asset protection" insurance – was not taxable.  *See Community First Credit Union v. United States*, 2009 WL 2058476, *1 (E.D. Wisc. 2009).  Bellco seeks the same result here.

After the Government's motion to dismiss on jurisdictional and procedural grounds was denied by this Court (Doc. # 25), both parties moved for summary judgment on the merits (Doc. ## 62, 66).  Response and reply briefs were duly filed (Doc. ## 81, 83, 89, 91).  At the parties' request (Doc. # 92), the Court heard oral argument on the motions on August 28, 2009.  Following this argument, the Court ordered supplemental briefing on a key question: whether the ultimate determination of the taxability of the income in question was a legal determination for the Court, or a factual determination for the jury.  (*See* Doc. # 102).  Both parties submitted briefs in response to this query (Doc. ## 107, 109).  At the same time, Bellco filed a motion to withdraw its jury demand (Doc. # 105), which the Government does not oppose (Doc. # 108), and which the Court herein grants.  Thus, the ultimate determination of whether the income in question is subject to UBIT will, as a practical matter, be made by the

Court.  The issue is whether that decision is to be made in the Court's role as the arbiter

of law, or as the finder of fact.  It is to that question that the Court first turns.

## STANDARD OF REVIEW

The basic contours of the Court's role in reviewing motions for summary

judgment are well-established:

> Rule 56(c) of the Federal Rules of Civil Procedure instructs that summary
> judgment is appropriate if "there is no genuine issue as to any material
> fact and . . . the movant is entitled to judgment as a matter of law."  Fed.
> R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247
> (1986); *T-Mobile* [*Central, LLC v. Unified Gov't of Wyandotte County*], 546
> F.3d [1299,] 1306 [10th Cir. 2008].  In making this determination, we
> "examine the record and all reasonable inferences that might be drawn
> from it in the light most favorable to the non-moving party."  *T-Mobile*, 546
> F.3d at 1306 (citations omitted).  At this stage, "[c]redibility determinations,
> the weighing of the evidence, and the drawing of legitimate inferences
> from the facts are jury functions, not those of a judge. . . .  The evidence of
> the non-movant is to be believed, and all justifiable inferences are to be
> drawn in his favor."  *Anderson*, 477 U.S. at 255.  However, "[w]here the
> record taken as a whole could not lead a rational trier of fact to find for the
> nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec.
> Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

*Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009).

Where, as here, there are cross-motions for summary judgment, each motion is

considered separately, and the evidence construed in favor of the party against whom

the motion under consideration was made.  *Pirkheim v. First Unum Life Ins. Co.*, 229

F.3d 1008, 1010 (10th Cir. 2000); *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*,

226 F.3d 1138, 1148 (10th Cir. 2000).  While, on cross-motions, the Court is "'entitled to

assume that no evidence needs to be considered other than that filed by the parties, . . .

summary judgment is nonetheless inappropriate if disputes remain as to material facts.'"

*Atlantic Richfield*, 226 F.3d at 1148 (quoting *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997)).

The rules for disputed facts are therefore clear – where disputes exist, summary judgment must be denied.  The more difficult question is what to do where the material facts are not in dispute, but reasonable minds could disagree as to the import of those facts as applied to the relevant legal standards, *i.e.*, whether AD&D income was "royalties" and whether credit insurance and financial services were "substantially related" to Bellco's purposes.  This is a classic "mixed question" of law and fact: "the facts are admitted or established and the law is undisputed; **the sole issue is whether the law applied to the facts satisfies the statutory standard**."  *Supre v. Ricketts*, 792 F.2d 958, 961 (10th Cir. 1986) (citing *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982)) (emphasis added); *cf. Nat'l Collegiate Athletic Ass'n v. Comm'r*, 914 F.2d 1417, 1418, 1420 (10th Cir. 1990) (tax court's determination of whether certain income was subject to UBIT presented mixed question).

The question, then, is who – the Court, or the factfinder – resolves this "sole issue."  That is, who applies the facts to the law?  The answer is important to the resolution of the parties' motions.  If the ultimate decision is one for the factfinder, summary judgment cannot be granted, even if the facts are undisputed, unless no reasonable factfinder could differ as to whether those undisputed facts meet the statutory standard.  *Cf. McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991) (noting that the issue of whether a person is a "member of a crew" under Jones Act is

13

a mixed question of law and fact, and thus "[i]f reasonable persons, applying the proper legal standard, could differ as to whether the employee was a 'member of a crew,' it is a question for the jury").  If, on the other hand, the ultimate decision is for the Court, the only thing precluding summary judgment is a genuine dispute over the historical facts; if those facts are undisputed, it is for the Court to apply the facts to the law.  *See* Hon. William W Schwarzer, Hon. Wallace A. Tashima, James M. Wagstaffe, *Practice Guide: Federal Civil Procedure Before Trial, National Edition* §§ 14:224-14:225.

Mixed questions are "typically . . . resolved by juries."  *United States v. Gaudin*, 515 U.S. 506, 512 (1995).  But "typically" does not mean "always."  The Court has not identified any binding precedent expressly addressing the issue in the context presented in this case, *i.e.*, a tax refund suit brought in the district court challenging the Government's UBIT determination.[6]  However, consideration of the basic principles animating the division of decisions between judges and juries suggests that the ultimate determination in this case is best left to the Court.

As the Supreme Court has recognized, drawing the line between matters for the jury and matters for the court is often "vexing."  *Pullman*, 456 U.S. at 288; *see also Miller v. Fenton*, 474 U.S. 104, 113-14 (1985) (Perhaps much of the difficulty in this area stems from the practical truth that the decision to label an issue a 'question of law,' a

---

[6]  This may be because, in order to litigate in the district court, a taxpayer must pay the alleged tax before suing for a refund.  *See* 26 U.S.C. § 7422; 28 U.S.C. § 1346(a)(1).  By contrast, a suit can be brought in the tax court without paying first.  Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts,* ¶ 115.2.1.  "For this and possibly other reasons, [the Tax Court] is the predominant forum for federal tax litigation."  *Id.*

'question of fact,' or a 'mixed question of law and fact' is sometimes as much a matter of

allocation as it is of analysis."). Commentators have explained that who makes the

ultimate application of facts to law typically "depends on whether [the ultimate issue] is

predominantly factual or legal." Hon. William W Schwarzer et al., *The Analysis and*

*Decision of Summary Judgment Motions*, 139 F.R.D. 441, 457 (1991); *see also Practice*

*Guide: Federal Civil Procedure Before Trial, National Edition* § 14:225; *cf. Miller*, 474

U.S. at 114 (noting that in circumstances where "the issue falls somewhere between a

pristine legal standard and a simple historical fact, the fact/law distinction at times has

turned on a determination that, as a matter of the sound administration of justice, one

judicial actor is better positioned than another to decide the issue in question"). Thus,

where the resolution "turns on an assessment of human behavior and expectations

within the common experience of jurors," it is usually for the jury to decide. Schwarzer,

139 F.R.D. at 457. On the other hand, where "a decision is likely to have significant

precedential impact on the resolution of an issue imbued with the need for consistency

and reasoned resolution, the balance tilts toward determination by the judge rather than

the jury." *Id.* at 459.

The ultimate decision of whether the income at issue in this case is exempt from

UBIT falls into this latter category. As a threshold matter, technical tax determinations

are not typically within the "common experience" of jurors – if they were, thousands of

accountants would be out of a job. More importantly, the ultimate determination may

well have "significant precedential impact." Bellco urges that this "test case" will help

inform the IRS's position on credit union tax issues generally.  And because issues of

tax liability affect a company's business planning, the risk of inconsistent jury verdicts on

the taxability of similar products strongly suggests a "need for consistency."  For all of

these reasons, the Court finds that the ultimate application of the facts to the UBIT

standards set out in the tax code is "predominantly legal" and thus properly for the

Court.[7]

This conclusion is consistent with the treatment of Tax Court decisions on similar

"mixed questions."  Unlike refund suits filed in federal district courts, in which a taxpayer

can demand a jury, *see* 28 U.S.C. §§ 2402, 1346(a)(1), the Tax Court makes both the

relevant findings of fact and conclusions of law.  *See* 26 U.S.C. § 7459(b); *see also*

*Anderson v. Comm'r*, 62 F.3d 1266, 1270 n.8 (10th Cir. 1995) (noting that Tax Court's

role as trier of fact includes weighing the evidence and drawing conclusions therefrom).

Therefore, just as it would for a district court trying a case without a jury, the appellate

court reviews the Tax Court's basic factual findings for clear error and its legal

conclusions de novo.  *Anderson*, 62 F.3d at 1270.  But on mixed questions, the

---

[7]  To be clear, the Court does not suggest that all "application of fact to law" questions in the tax context are matters for the courts.  Indeed, in *Commissioner v. Duberstein*, 363 U.S. 278 (1960), the Supreme Court explained that the determination of what qualifies as a "gift" under the tax code was for the factfinder, and appellate review of the determination was circumscribed.  *Id.* at 290-91.  But this conclusion does not alter the Court's analysis.  The "gift" determination, the Supreme Court noted, was "nontechnical" and "close[ly] relat[ed] . . . to the date of practical human experience."  *Id.* at 289.  This assessment comports with the basic distinction between ultimate questions for the factfinder – which focus on "human behavior and expectations within the common experience of jurors," Schwarzer, 139 F.R.D. at 457, and ultimate questions for the courts, which are of a more technical nature.  Unlike the "gift" assessment, the Court finds the UBIT determination to be more legal than factual.

standard of review turns on whether the question is primarily factual or legal. *Id.* Where the challenge is to the Tax Court's application of the law to the facts, the Tenth Circuit is clear that the review is de novo. *Anderson*, 62 F.3d at 1270 ("Where, as here, 'the sole issue is whether the law applied to the facts satisfied the statutory standard, we review the Tax Court's application of the law to the facts de novo' . . . ." (quoting *Nat'l Collegiate Athletic Ass'n*, 914 F.2d at 1420)). In other words, the Tenth Circuit has recognized that the Tax Court's application of law to facts is primarily a **legal** determination. The same principle applies in this case. The application of historical facts to the statutory UBIT standards is primarily a legal issue, and thus should be left to the Court.

The Court also notes that the parties appear to agree with this conclusion. As explained above, Bellco has withdrawn its jury demand (Doc. # 105), essentially conceding that the ultimate determination in this case is best left to the Court. And the Government, in responding to the Court's order for supplemental briefing on the Court/jury question, noted that while the analysis in this case presented mixed questions of law and fact, those questions "primarily involve[ ] the consideration of legal principles" capable of resolution by the Court. (Doc. # 107 at 2).

For all of these reasons, the Court concludes that the ultimate determination of whether the income at issue is taxable is an issue for the Court to decide. In reviewing the parties' summary judgment motions, then, the only question is whether there is a

genuine dispute over material, historical facts.  Where those facts are clear and

undisputed, the Court will apply those facts to the relevant legal standards.

Finally, a word on how granular the Court's analysis of the particular income

streams should be.  Bellco lumps together all of the income received from each product,

analyzing the product generally rather than the income source specifically.  The

Government, by contrast, breaks out each individual income source, *e.g.*, for

credit insurance, the Government separately analyzes (1) income from direct loans,

(2) income from indirect loans, and (3) Bellco's share of CUILA's income.  The Court

finds that the Government's approach is more consistent with the relevant regulations.

*See, e.g.*, 26 C.F.R. § 1.513-1(d)(2) ("[F]or the conduct of trade or business from which

**a particular amount of gross income** is derived to be substantially related to purposes

for which exemption is granted, the production or distribution of the goods or the

performance of the services from which the gross income is derived must contribute

importantly to the accomplishment of those purposes.").  Therefore, the Court will

separately analyze each discreet stream of income.

## ANALYSIS

With these standards as a guide, the Court turns to the three products at issue,

keeping in mind that, as the taxpayer, Bellco shoulders the burden of demonstrating that

it is entitled to a refund.  *Dye v. United States*, 121 F.3d 1399, 1408 (10th Cir. 1997)

(citing *United States v. Janis*, 428 U.S. 433, 440 (1976)).

I.    **CREDIT INSURANCE AND FINANCIAL SERVICES**

The Government assessed UBIT on Bellco's income from credit life and disability

insurance and from financial products and services.  Bellco's basic argument is that this

income is not taxable because the activities that produced the income were closely

related to Bellco's basic function.  The Government, obviously, disagrees.

The parties do not dispute the relevant legal standards.  To be safe from UBIT,

income must be generated by an activity "substantially related to [Bellco's] tax-exempt

purposes."  *United States v. American College of Physicians*, 475 U.S. 834, 839 (1986);

*see also* 26 U.S.C. § 513(a).  The parties agree that, under Colorado law, Bellco's tax-

exempt purposes are (1) the promotion of thrift and (2) the creation of credit at fair and

reasonable rates, and that both purposes focus on Bellco's members.  Gov't MSJ at 22;

Bellco Resp. at 42.[8]

An activity is "substantially related" to these purposes if it "contribute[s]

importantly" to their accomplishment.  26 C.F.R. § 1.513-1(d)(2).  In evaluating this

issue, courts often consider whether the activity evidences a real intent to further the

tax-exempt purposes or, on the other hand, whether the entity's true motive is revenues

and profits.  *See, e.g.*, *Independent Ins. Agents of Huntsville, Inc. v. Comm'r*, 998 F.2d

898, 902 (11th Cir. 1993); *Illinois Ass'n of Prof. Ins. Agents, Inc. v. Comm'r*, 801 F.2d

---

[8]  The parties dispute the exact source of Bellco's member-focused mission.  The
Government claims the requirement stems from the federal law's requirement that a credit union
be organized for "mutual purposes," while Bellco claims it arises from the state law's definition
of a credit union as a "cooperative association."  (Doc. # 69 at 21-22; Doc. # 81 at 42).  But
whatever the source, the parties agree that a member-service purpose is important to the
inquiry.

987, 994 (7th Cir. 1986); *Louisiana Credit Union League v. United States*, 693 F.2d 525, 538 (5th Cir. 1982).  The determination of substantial relation "depends in each case upon the facts and circumstances involved."  26 C.F.R. § 1.513-1(d)(2).

### A.    Credit Insurance

As discussed above, Bellco's credit insurance income came from three specific sources: "direct lending" operations, where Bellco employees themselves initiated the loans and sold the accompanying insurance; "indirect lending" operations, managed by CUILA, through which automobile dealers offered purchasers financing, and credit insurance, through Bellco; and Bellco's share of CUILA's net income.

### 1.    Direct Loans

Most of the basic facts concerning the structure and workings of the direct loan program are established.  However, upon review of the record, the Court finds that one critical fact – Bellco's profit motive – is in dispute, or at least unclear.  For example, the Government cites to an email exchange by employees of Minnesota Life, which provided Bellco's direct loan insurance, noting that Bellco would not be amenable to lowering their premium rate in order to bring the "loss ratio" up to Colorado's required 40% (*i.e.*, $0.40 paid out for every $1 taken in).  (Doc. # 67, Ex. H-2).  The email notes that the "worst thing" Minnesota Life could do would be to lower rates and then have unexpected claims come in, leading to "high losses."  (*Id.*).  The email also states that if the loss ratio did rise, "we would be able to increase [Bellco's] premium rate which in turn would give them more fee income. (a positive?)"  (*Id.*).  On the other hand, Bellco

points to testimony that Minnesota Life approached Bellco numerous times with requests to lower Bellco's rates, and that Bellco often did so, lowering rates to the members while keeping commissions the same.  (Doc. # 81, Ex. 24, at 128:7-21). The Court finds a genuine dispute over whether and to what extent Bellco was motivated by profits in offering credit insurance.

Given the importance courts have placed on an entity's profit motive, the Court finds this dispute enough to preclude an entry of summary judgment for either Bellco or the Government.  At trial, it will be up to the Court, as the finder of fact, to weigh this evidence and evaluate credibility in order to determine the extent of Bellco's profit motive.  That historical fact will then be evaluated, along with all other facts and circumstances, and applied to the statutory standards to determine whether income from direct loans was "substantially related" to Bellco's tax-exempt purpose.

2.    *Indirect Loans*

Like the direct lending program, the basic structure of the indirect lending program is essentially undisputed.  However, like the direct lending program, the Court finds the record is unclear on precisely what, if any, profit motive drove Bellco's participation in the indirect lending program.  The Court notes that it is not obvious from the record whether the same loss ratio considerations apply to Bellco's indirect loans. But this lack of clarity further cautions against deciding this issue in either party's favor without a full presentation of the facts at trial.

3.    *CUILA Income Share*

The final source of credit insurance income is Bellco's share of CUILA's net income on all sales of credit life and disability insurance.  Bellco does not deny that CUILA's income included commissions from credit insurance policies sold to individuals who were not Bellco members.  (Doc. # 69 at 11, ¶ 26; Doc. # 81 at 10, ¶ 26). However, it appears from the record that these policies were all sold to members of some credit union, even if not Bellco.  (*See* Doc. # 67, Ex. B at 36:11-37:16).

The Government argues that income from sales to non-Bellco members cannot, by definition, be "substantially related" to Bellco's member-focused, tax-exempt purpose.  (*See* Doc. # 69 at 30).  The cases cited by the Government – which involve postal unions receiving income from the provision of health insurance to persons who were not, and never had been, postal workers – hold that income generated by sales to persons **completely** unrelated to the entity and its mission cannot meet the substantial relation test.  *See Nat'l League of Postmasters of United States v. Comm'r*, 86 F.3d 59 (4th Cir. 1996); *Nat'l Ass'n of Postal Supervisors v. United States*, 944 F.2d 859 (Fed. Cir. 1991); *American Postal Workers Union, AFL-CIO v. United States*, 925 F.2d 480, 483 (1991)  Thus, were the CUILA sales to persons who were not members of a credit union at all, the Court would unquestionably agree with the Government's argument. However, in this case it appears (although, again, it is not entirely clear) that the "non-member" sales were still made to members of the credit union movement as a whole.

The Court finds it possible, depending on the particulars of CUILA's sales process, that sales to members of credit unions generally might "contribute importantly" to the promotion of Bellco's own members' thrift and credit. The record shows that CUILA was formed to give credit unions, collectively, additional bargaining power (Doc. # 67, Ex. J at 65:9-66:5), which presumably could lead to better value for individual members. At this stage of the proceedings, the factual record on the precise workings of CUILA's insurance sales is unclear. Moreover, the parties have not discussed, in more than a cursory fashion, the question of whether a line of business that (arguably) benefits the credit union movement as a whole could be considered "substantially related" to an individual credit union's mission. The Court finds that this issue is insufficiently presented to permit a thorough analysis, and denies summary judgment as to either party. At trial, the parties should be prepared to present additional evidence and more developed legal arguments on this issue.[9]

**B.      Financial Services**

The relevant historical facts concerning Bellco's income from financial services are not in dispute. The bulk of the income was generated as a result of commissions paid to Bellco as a result of CFS's sales of financial products, typically to Bellco

---

[9] The Court does note that Bellco's argument that the CUILA income share is de minimis – less than 10% of its gross income from credit insurance during the years in question – is inapposite. (Doc. # 81 at 47). As discussed above, the Court is under an obligation to examine each discreet income source. The relatively small nature of one portion of income *vis a vis* another does not abdicate the requirement that the specific income source must meet the substantial relation test.

members.  Bellco's income also included a share of the profits of Member Gateways.
The Court considers these income streams in turn.

### 1.    CFS Commissions

Although the background facts are undisputed, the parties characterize those
facts in dramatically different ways.  Bellco urges that it earned income from "financial
counseling" and "financial education."  (Doc. # 62 at 34).  The Government responds
that the income was little more than compensation for CFS's renting space in Bellco's
offices.  (Doc. # 69 at 33).  Neither position accurately describes the true relationship
between Bellco and CFS.  While CFS did offer educational components, the real source
of Bellco's income was commissions on product sales.  On the other hand, while CFS
certainly benefitted from the use of Bellco's space and the proximity to its members,
there is nothing in the record to suggest that Bellco would have provided the space to
just anyone.

As a whole, it is clear that Bellco received income from the sale of products,
such as stocks and annuities, that CFS and Bellco both considered helpful to Bellco
members' financial needs.  Indeed, CFS specifically trained Bellco employees on how
CFS's program related to Bellco members' needs and financial goals.  (Doc. # 62 at 15,
¶ 71; Doc. # 83 at 12, ¶ 71).  The Court finds that this relationship, which allowed Bellco
members to plan and invest for the future, is substantially related to Bellco's purpose of
promoting member thrift.

24

The Government does not directly argue that financial products and education do not promote thrift, but rather focuses on the fact that it was a third party, the CFS representative, that actually provided the financial services.  The Court is not persuaded.  The Government cites to no authority suggesting that the mere fact that a product is provided by a third party rather than the tax-exempt entity itself necessarily means that the resulting income to the tax-exempt entity is taxable.  Indeed, the IRS regulations suggest just the opposite.  In discussing what sort of income is "substantially related," the regulations give the example of income earned by a trade association from charges to exhibitors at a trade show promoting industry products.  26 C.F.R. § 1.513-1(d), Example 3.  Noting that stimulating interest and demand for industry products is one of the reasons the entity was granted an exemption, the regulations state that the activities productive of this income contribute importantly to the trade association's tax-exempt purpose.  *Id.*  The fact that it was actually third-parties – the exhibitors – promoting the products did not change the analysis.  The same is true here.  Regardless of the fact that CFS, not Bellco, actually made the sales, Bellco still earned income as a result of the provision of important financial products to its members, and those products and the related financial services contributed importantly to encouraging member thrift.

The Government also argues that the financial services income was "rendered unrelated as a matter of law" because some of the income derived from products sold to non-members.  The Court agrees, in part.  As discussed above, the **specific income**

from the sale of products to persons who are not members of a credit union at all cannot be considered substantially related to Bellco's tax-exempt purpose.[10]  Bellco does not really contest this position, but rather argues that the income earned through non-member sales was de minimis.  (Doc. # 81 at 51 n.10).  But Bellco cites no case law to suggest that income unrelated to its tax-exempt purpose, no matter how minor, can be shielded from UBIT.

On the other hand, the Court finds that the Government's claim that such de minimis sales render the **entirety** of Bellco's financial services income "unrelated" tacks too widely in the other direction.  Consistent with the IRS's regulations, the Court considers each "particular amount of gross income" in determining whether the activities that generated that income contribute importantly to Bellco's purposes.  26 C.F.R. § 1.513-1(d)(2).  Simply put, the income from financial services to members meets that test.  The income from financial services to non-credit union members does not.  Bellco is entitled to summary judgment on its claim that income derived from financial services **to members** is not taxable; the Government is entitled to summary judgment on the converse claim that income derived from financial services **to non-members** is subject to UBIT.[11]

---

[10]  Unlike CUILA's credit insurance sales, which were apparently made to members of other credit unions, people who purchased CFS's products were not required to be a member of a credit union at all.  (*See* Doc. # 67, Ex. N at 69:17-25).

[11]  As the parties have not provided a specific division on income from these two sources, the Court does not, at this point, determine the precise amount of Bellco's refund. That issue will be subject to further briefing or resolution at trial.

2.    *Member Gateways*

Bellco also categorized as "financial services" income its share of the profits of Member Gateways.  As described above, Bellco had a 4% ownership interest in Member Gateways; Member Gateways, in turn, invested in CFS.  (Doc. # 69 at 13, ¶ 32; Doc. # 81 at 11, ¶ 32).  Presumably, Bellco's theory is that this income is not taxable because it is connected to CFS, which provided financial services to Bellco's members.  The Government contends that this tangential relationship is insufficient to meet the "substantial relation" test.  (Doc. # 69 at 34).  In response, Bellco argues only that this income was de minimis as compared to its income from the sale of financial products and services to members.  (Doc. # 81 at 51 n.10).  As already discussed, this *de minimis* theory cannot stand.  Without any other explanation or evidence to demonstrate how this profit share is substantially related to Bellco's purposes, Bellco has not carried its burden to show that it is entitled to a refund of the taxes paid on its income from Member Gateways' distributed profits.  The Government is entitled to summary judgment on this issue.

## II.    ACCIDENTAL DEATH & DISMEMBERMENT INSURANCE

The final general product involved in this litigation is accidental death and dismemberment insurance, provided to Bellco members by Affinion.  Unlike credit insurance or financial services, Bellco does not argue that AD&D was "substantially related" to its tax-exempt purposes.  Rather, Bellco contends that the income it earned

from AD&D should be considered "royalties" and thus excluded from the computation of UBIT.  26 U.S.C. § 512(a)(1), (b)(2).

Royalties are not defined in the code; like the question of substantial relation, whether income is considered "royalties" "shall be determined by all the facts and circumstances of each case."  26 C.F.R. § 1.512(b)-1.  However, cases have provided some relevant markers to aid in the determination.  The parties agree that the key question is whether the income in question is a payment for the use of intangible property (such as a customer list), in which case the income is royalty, or, instead, payment for services rendered by the owner of such property, in which case it is not. *See, e.g.*, *Sierra Club, Inc. v. Comm'r*, 86 F.3d 1526, 1532 (9th Cir. 1996).  Provision of some minimal service does not necessarily negate the exemption; "[t]he question is whether [the tax-exempt entity] did little enough work for the money they received to be royalties, . . . or whether they did too much, so that the money was taxable as unrelated business income."  *Oregon State Univ. Alumni Assoc., Inc. v. Comm'r*, 193 F.3d 1098, 1099 (9th Cir. 1999); *see also Common Cause v. Comm'r*, 112 T.C. 332, 342 (Tax Ct. 1999) ("[T]he owner of an intangible may engage in certain activities to exploit and protect the intangible which do not change the nature of the payment received.").

This issue is not appropriate for summary judgment.  Critical, historical facts concerning Bellco's role in the AD&D program are in dispute.  For example, it is unclear from the record the extent of Bellco's participation in the creation of solicitation communications.  The agreement between the parties appears to require much of

28

Bellco, committing it to "[a]uthorize and coordinate [a]nnouncement [m]ailings." (Doc. # 67, Ex. L-36). On the other hand, a senior Bellco official testified that Bellco's involvement in the solicitation materials was limited to editing a "sample letter" generated by Affinion for "style and tone." (Doc. # 67, Ex. N, at 28:14-22; 50:8-51:16).

In addition, there is conflicting evidence over Bellco's involvement in billing its members for the AD&D premiums. One witness testified that premium payments would be taken out of members' accounts "with Bellco's support." (Doc. # 62, Ex. 6, at 183:4-12). Another witness described a less involved process, describing the process as an "automatic deduction" where "somewhere a computer whirrs to life and the money disappears from one account and is added to another." (*Id.*, Ex. 1 at 86:2-87:10).

Further, although it is undisputed that Bellco spent 683 hours on the AD&D program in 2003, the record is not clear as to how all of these hours were spent. Bellco submitted an affidavit from its chief financial officer stating that 70% of those hours were simply answering basic, "ministerial" inquiries about the AD&D program. (Doc. # 81, Ex. 22, ¶ 6). But even assuming that fielding member questions is the sort of activity that does not affect the royalties characterization, it is unclear how the other 30% of the time – which amounts to over 200 hours – was spent. The "time analysis" for Bellco's 2003 tax year indicates that these hours were spread between several senior executives, including the president, chief financial officer, and a number of senior vice presidents. (Doc. # 67, Ex. P-31, at B0006383-B0006386). Without knowing the details of these activities, the Court cannot determine whether the hours were sufficiently de

29

minimis.  *Cf. Oregon State Univ. Alumni Ass'n, Inc. v. Comm'r*, 193 F.3d 1098, 1101-02

(9th Cir. 1999) (fifty hours of clerical work over two years, in return for over $1,000,000

of income from use of alumni association name and mailing lists, was de minimis).

Finally, it is important to note that Bellco received AD&D income from two

sources – an "administrative allowance" and a "marketing bonus."  It is not clear at

this point whether, if one source is found to be royalty payments, the other source

necessarily will be as well.  That is, it may be, depending on the facts presented at trial,

that Bellco is entitled to claim a royalties tax exemption for one, but not both, of these

income streams.  The Court cautions the parties to be prepared to present evidence

on the precise nature of both sources of income.

In sum, the Court finds that, on the present state of the record, neither party is

entitled to summary judgment on this issue.

## III.    BELLCO'S ACCOUNTING FOR PORTIONS OF REFUND

The Government moves for summary judgment on one final ground: that Bellco's

records are too scant to support its claims for refunds on certain specific portions of its

taxable income.  A taxpayer bears the burden of proving not only its entitlement to a

refund generally, but also "the amount of the refund to which the taxpayer is entitled."

*Dye*, 121 F.3d at 1408; *cf. Jones v. Comm'r*, 903 F.2d 1301, 1303 (10th Cir. 1990)

("As a taxpayer, [plaintiff] has the duty to maintain adequate and accurate records to

enable him to file a tax return.").  The Government points to two specific pools of income

that it claims Bellco has not adequately accounted for: its tax year 2000 income from

credit insurance; and all of the income that was actually earned by First Choice Credit Union.  The Court addresses each in turn.

### A.     2000 Credit Insurance Income

It is undisputed that detailed transaction data is "no longer available" for Bellco's credit insurance income earned in the year 2000.  (*See, e.g.*, Doc. # 67, Ex. A at 16). The question is whether this lack of information necessarily defeats Bellco's refund claim.  The Government specifically cites the 30(b)(6) deposition testimony of Bellco's director of finance, who explains that Bellco can no longer identify the specific sources of income.  (Doc. # 67, Ex. B at 21:1-22; *see generally* Doc. # 69 at 7-8 ¶ 12).  The deposition testimony goes on to state that, without the detailed information, Bellco cannot "go back and actually identify which portions [of the income] come from Minnesota Life versus those portions that may be indirect."  (Doc. # 67, Ex. B at 21:6-10).  The deponent also noted that it was possible that the 2000 income includes payments made by CUILA.  (*Id.* at 20:23-25).  Minnesota Life was the insurance company that supported Bellco's direct lending credit insurance.  And "indirect" may well be a reference to the indirect lending insurance program that Bellco participated in – which was administered by CUILA.  Drawing inferences in Bellco's favor, as the Court must, this deposition testimony could therefore mean that, although Bellco cannot specifically divide out its income, the only two sources of income were from the direct

and indirect lending programs.[12]  As discussed above, it is possible that Bellco could

prove, at trial, that both of these products meet the "substantial relation" test.  In that

case, Bellco would be entitled to a refund of taxes paid on both.  Therefore, again

assuming that all of the 2000 income was from the direct and indirect programs,

Bellco's inability to apportion between the two would become irrelevant.

The Government also briefly argues that Bellco has acknowledged errors in its

calculation of credit insurance income, meaning the figures included in Bellco's tax

returns are not accurate.  But again, assuming Bellco prevails on its arguments for

direct and indirect loan credit insurance, it would be entitled to claim all such income

as exempt from UBIT.  Regardless of the accuracy of the underlying numbers, Bellco

would be due a full refund.  For these reasons, the Government cannot prevail on its

argument at this stage of the proceedings.

**B.     First Choice Income**

Bellco's tax returns also include relatively small amounts of income from First

Choice Credit Union, with which Bellco merged in July 2003.  (Doc. # 69 at 5-6, ¶ 7;

Doc. # 81 at, 5 ¶ 7).  Because the merger was accounted for using the "pooling of

interest" method, Bellco's financial statements were retroactively restated to reflect the

two companies' combined financial positions.  (*Id.*).  The Government argues that Bellco

---

[12]  Of course, it is also possible that the deposition testimony means something else; that "indirect" refers to sources of income other than the indirect lending program or that the reference to Minnesota Life refers to a different product or income source than the direct lending program.  But reaching such a conclusion would require the Court to draw inferences against Bellco, which it must not do on the Government's motion for summary judgment.

"cannot provide any information" about the sources of First Choice's income other than

the fact that it was categorized in the general ledger as credit insurance, financial

services, and AD&D.  (Doc. # 69 at 6, ¶ 8).  Bellco disputes this claim, but can only

point to superficial descriptions of the income sources.  (Doc. # 81 at 6, ¶ 8 (citing Doc.

# 67, Ex. B, at 12:17-13:25 (noting that financial services income was from investment

services provided by a company called FNIC, but also noting that there were no records

of where the income came from); 14:10-23 (ledger indicated income from AD&D

product, but there was no indication of what type of AD&D product except for fact that

First Choice received a quarterly payment); 15:18-16:15 (indication of credit life income

dollar amounts in general ledger, but "no indication of the name of the carrier or

anything to that effect"))).  Particularly given the fact that First Choice was an entirely

different company, and thus may well have been offering entirely different products

(albeit under the same general product name), the Court finds that these cursory

descriptions are not sufficient to allow evaluation of actual source of the relevant

income.  Without additional evidence, Bellco has not met its burden to show its

entitlement to a refund of the portion of the taxes paid on First Choice's income.

Summary judgment in the Government's favor is therefore appropriate as to this issue.

## CONCLUSION

For the reasons stated above, it is ORDERED as follows:

1.      Bellco's Motion for Summary Judgment (Doc. # 62) is GRANTED in part

and DENIED in part.  Bellco is entitled to summary judgment on its claim

that its financial services income from the provision of products and services to members is "substantially related" to Bellco's tax-exempt purposes, and thus validly exempt from UBIT;

2.    The United States' Motion for Summary Judgment (Doc. # 69) is similarly GRANTED in part and DENIED in part.  The Government is entitled to summary judgment on its claims that (1) Bellco's financial services income from the provision of products and services to non-members; (2) Bellco's financial services income from its share of Member Gateways' profits; and (3) Bellco's income that was actually earned by First Choice, are not entitled to protection from UBIT;

3.    Whether the remaining sources of income – (1) direct loan credit insurance; (2) indirect loan credit insurance; (3) Bellco's share of CUILA's income; and (4) AD&D – are exempt from UBIT must await resolution at trial.  The Court directs the parties to pay particular attention to the following issues:

  a.    What, if any, profit motive drove Bellco in its offering of direct and indirect credit insurance, and how does that profit motive, if any, impact the analysis in the present case;

  b.    The specifics of CUILA's sale of credit insurance to non-Bellco members, and whether and how those sales relate to Bellco's tax-exempt purposes;

    c.       Whether income derived from products sold to credit union members as a whole can be considered "substantially related" to an individual credit union's tax-exempt purposes; and

    d.       The historical facts surrounding Bellco's role in the provision of AD&D insurance to its members.

4.      Bellco's Motion for Leave to Withdraw Jury Demand (Doc. # 105) is GRANTED.  The remaining issues in this case shall be tried to the Court.

DATED:  November __12__, 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge