**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 08-cv-01071-CMA-KMT

BELLCO CREDIT UNION,

     Plaintiff,

v.

THE UNITED STATES OF AMERICA,

     Defendant.

_____

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

_____

     This tax case involves a dispute over whether Plaintiff Bellco Credit Union was required to pay "unrelated business income tax" for income on certain products and services.  Three specific products are at issue in this litigation: (1) credit life and credit disability insurance; (2) financial services; and (3) accidental death and dismemberment insurance.  On November 12, 2009, the Court granted in part (Doc. # 114) the parties' cross-motions for summary judgment.  The Court fully disposed of the issue of tax liability for the financial services income.  (Doc. # 114 at 33-34.)  The Court also found that income attributed to First Choice Credit Union, with which Bellco merged in 2003, was subject to taxation.  (*Id.* at 34.)  The Court withheld judgment on the tax liability for the remaining products – credit life and disability insurance and accidental death and dismemberment insurance – until trial.  (*Id.*)

     Prior to trial, the Court ordered that issues of liability were to be bifurcated from the computational issues concerning what, if any, refund was due to Bellco.

(Doc. # 127.)  Beginning on December 7, 2009, the Court held a four-day bench trial limited to the liability question.  The Court now enters its findings of fact and conclusions of law.

## I.  FINDINGS OF FACT

### A.    BELLCO

Bellco, which is organized and incorporated under the laws of the State of Colorado, was originally formed by employees of Mountain Bell Telephone Company. (Doc. # 146, ¶¶ 1, 9; Trial Ex. 53.)  By law in Colorado, a state-chartered credit union is a cooperative association that exists for the twofold purpose of promoting thrift among its members and creating a source of credit for them at fair and reasonable rates of interest.  (Doc. # 146, ¶ 10.)  *See also* Colo. Rev. Stat. § 11-30-101(1)(a).

Credit unions generally, and Bellco specifically, are cooperative financial institutions formed by their members for their members.  (Doc. # 146, ¶ 11.)  Bellco and its capital are owned by the members; it has no shareholders.  (Doc. # 146, ¶¶ 12, 14.) This means that any profits made by Bellco are used to benefit the members. (Testimony of D. Ferraro, Doc. # 140 at 14.)  The profits are used, for example, to pay higher rates to depositors, to offer lower rates to borrowers, or to offer additional member services.  (Testimony of D. Ferraro, Doc. # 140 at 12-13.)  Indeed, Bellco is not permitted to pay interest on its deposit accounts unless it has profits.  (Testimony of D. Ferraro, Doc. # 140 at 13, 22.)

By law, Bellco must hold at least seven percent of its assets in capital. (Testimony of D. Ferraro, Doc. # 140 at 25.)  Because Bellco cannot sell stock or issue debt, this seven percent capital requirement must be accumulated through the profits

2

that Bellco does not distribute to its members.  (Testimony of D. Ferraro, Doc. # 140 at 11, 25.)

Bellco is governed by a voluntary board of directors who do not receive any salary for serving.  (Doc. # 146, ¶ 13.)  Bellco's board of directors is elected by its members, with each member having one vote.  (Doc. # 146, ¶ 13.)  All of the decisions made by the board are made for the benefit of the members.  (Testimony of D. Ferraro, Doc. # 140 at 10.)

**B.    BELLCO'S TAX STATUS**

Pursuant to 26 U.S.C. § 501(c)(14)(A), Bellco is generally exempt from federal income tax.  (Doc. # 146, ¶ 2.)  However, like other tax-exempt organizations, Bellco is subject to the unrelated business income tax ("UBIT").  This tax applies to income from any unrelated trade or business – defined as activity "which is not substantially related . . . to the exercise or performance . . . of [Bellco's] charitable, educational, or other purpose or function constituting the basis for its exemption" – that it regularly carries on. 26 U.S.C. §§ 512-513.

The tax years at issue in this litigation are 2000, 2001, and 2003.  For those years, Bellco paid a total of $199,293 in taxes: $18,946 for the 2000 tax year; $56,317 for the 2001 tax year; and $124,030 for the 2003 tax year.  (Doc. # 146, ¶ 6.)

Bellco earned income on the two products at issue – credit life and disability insurance and accidental death and dismemberment insurance – from several sources. Each discrete stream is discussed below, but the relevant income is summarized as follows:

|  | Tax Year 2000 | Tax Year 2001 | Tax Year 2003 |
|---|---|---|---|
| **Credit Insurance** | | | |
| Income from "direct" loans | $551,048[1] | $460,013 | $410, 218 |
| Income from "indirect" loans | | $43,466 | $52,955 |
| Income from share of CUILA profits | | | $145,795 |
| **Accidental Death & Dismemberment Insurance** | | | |
| General income | | | $199,295 |

(Doc. # 66 at 4, ¶ 3; Doc. # 81 at 4-5, ¶ 3.)

Although the tax liability in question accrued in the early 2000s, Bellco, believing that none of its income was taxable, did not actually file timely tax returns for those years.  It was not until 2007 that the IRS contacted Bellco and requested that it file forms reporting UBIT for the years 2000-2005.  (Testimony of C. Koth, Doc. # 141 at 313-14.)  Bellco filed the requested forms and paid its taxes but, in October 2007, filed amended tax returns asserting that none of the income was subject to UBIT and requesting a refund of the taxes it previously paid.  (Doc. # 146, ¶ 7.)  That refund request is the genesis of this litigation.

## C.    CREDIT LIFE AND DISABILITY INSURANCE

1.    <u>General Background on Credit Life and Disability Insurance</u>

Credit life insurance has been offered by credit unions for nearly a century.  (Doc. # 146 ¶ 15.)  Generally, credit life insurance pays the outstanding balance on the loan it

---

[1]  Bellco's year 2000 income from credit life and disability insurance is not itemized.

insures in the event of the borrower's death, meaning that the borrower's estate has no obligation to pay the debt.  (Doc. # 146, ¶¶ 20, 26, 29.)  Similarly, credit disability insurance covers the regular payments due on the loan it insures if a borrower becomes disabled and unable to work during the term of the loan.  (Doc. # 146, ¶¶ 20, 27.)  For ease of reference, the Court refers to credit life insurance and credit disability insurance, collectively, as "Credit Insurance."

While there are some minimal underwriting conditions for Credit Insurance – such as an age limit and a few simple health qualifications – applicants for Credit Insurance offered on Bellco loans need not go through a full health examination or the other rigors typical of other insurance products.  (Testimony of M. Hullsiek, Doc. # 141 at 220-21.)

Credit Insurance is typically offered at the time of the loan.  However, in the initial application to join Bellco, a member can indicate that he or she would be interested in Credit Insurance on future loans.  (Testimony of D. Ferraro, Doc. # 140 at 97; Testimony of N. Bedan.[2])  Although the loan agent is supposed to discuss Credit Insurance at the time of closing, Credit Insurance could be applied to a future loan based solely on this initial application.  (Testimony of N. Bedan.)

Obtaining Credit Insurance is never a condition of the member receiving the loan, as such a condition would be unlawful.  (Doc. # 146, ¶ 19.)

---

[2]   The transcripts of certain witnesses' testimony, including Ms. Bedan's, were not ordered by counsel and therefore page numbers of specific testimony are not available. Citations to these witnesses' testimonies will be by name only.

2.    Bellco's Sources of Credit Insurance Income

a.    Direct Lending

The majority of the Credit Insurance income at issue in this case was earned as a result of the sale of insurance on Bellco loans initiated by Bellco employees (the "Direct Lending Program").  (Doc. # 146, ¶ 17.)  Members paid for this insurance by authorizing Bellco to collect a monthly premium, determined by multiplying a fixed rate per thousand dollars by the current outstanding loan balance.  (Doc. # 146, ¶¶ 23, 28.)  As a result of this formula, the monthly premium declined as the loan balance was paid down.  (Doc. # 146, ¶¶ 24, 28.)

In the early 1990s, Bellco switched its provider of Credit Insurance from CUNA Mutual Insurance Society to Minnesota Life.  (Testimony of D. Ferraro, Doc. # 140 at 41-42; Doc. # 146, ¶¶ 17-18.)  Under CUNA Mutual's program, Bellco was not selling much insurance.  The loss ratio – the amount of claims incurred as compared to the amount of premiums collected – was very high, and, as a result, the premium rates were set to increase "fairly substantially."  (Testimony of D. Ferraro, Doc. # 140 at 42, 85.)

Minnesota Life proposed a lower rate and a training and support program to increase sales of the insurance product.  (Testimony of D. Ferraro, Doc. # 140 at 42.)  Sales of Credit Insurance went up and the Direct Lending Program became more profitable.  (Testimony of D. Ferraro, Doc. # 140 at 44.)  When, later on, Bellco members made claims under their policies, the profits were used to pay those claims.  (Testimony of D. Ferraro, Doc. # 140 at 44.)  In addition, increased sales meant that more members had insurance and that, because the risk was spread among a larger

6

base, the costs of the insurance to Bellco members was lower.  (Testimony of S. Jentz, Doc. # 142 at 413-14; Depo. Testimony of P. Haught at 124:11-20.)  Bellco's perspective on Credit Insurance was to keep costs as low as possible, to expand the number of borrowers taking advantage of the insurance, and to make some reasonable profit along the way.  (Depo. Testimony of P. Haught at 126:13-20.)

After contracting with Minnesota Life as its provider of Credit Insurance for the Direct Lending Program, Bellco was able to both reduce premium rates and improve the program's benefits.  (Testimony of D. Ferraro, Doc. # 140 at 44.)  For example, Bellco changed the benefits on its credit disability insurance program from a 30-day non-retroactive benefit – meaning a member would have to be disabled for 30 days before qualifying for insurance coverage and, then, coverage would not take effect until after that 30-day period – to a 14-day retroactive benefit – meaning that a member would qualify for coverage after only two weeks and the insurance would make payments retroactive to the initial date of the disability.  (Testimony of D. Ferraro, Doc. # 140 at 45-46; Testimony of M. Hullsiek, Doc. # 141 at 237-38.)  This liberalization of the benefit meant that more disabilities were covered and that, once a member qualified, the benefits paid were more generous.  (Testimony of M. Hullsiek, Doc. # 141 at 244.)

      b.    <u>Indirect Lending</u>

Bellco also earned Credit Insurance income through a lending program, offered at automobile dealerships, that allowed credit union members to get automobile loans at the dealership rather than having to go to a credit union branch (the "Indirect Lending Program").  (Doc. # 146, ¶ 32; Testimony of D. Ferraro, Doc. # 140 at 49.)  Unlike the Direct Lending Program, in which a Bellco representative presented the Credit

Insurance option, the offer and sale of Credit Insurance through the Indirect Lending

Program was handled entirely by dealership employees.  (Testimony of D. Ferraro, Doc.

# 140 at 107.)

In the mid-1990s, Bellco, along with a few other credit unions (the "Credit Union

Consortium), signed agreements with automobile dealerships to start the Indirect

Lending Program.  As a result of the Indirect Lending Program, credit union members

who applied for their loan indirectly from the dealership were able to obtain the same

interest rate on the loan that they would have obtained had they applied for the loan

directly with their credit union.  (Testimony of D. Ferraro, Doc. # 140 at 50-51.)  Bellco

offered so-called "flat rates" – the advertised loan rate was the rate the borrower would

get.  (Testimony of J. Ruby.)  This is compared to a "buy rate" used by many other

financial institutions; with a buy rate, the dealer could mark up the rate beyond the rate

the lender had approved.  (Testimony of J. Ruby.)  The restriction precluding dealers

from marking up loan rates was expressly insisted on by the Credit Union Consortium

when it instituted the Indirect Lending Program with automobile dealerships.

(Testimony of D. Ferraro, Doc. # 140 at 50-51.)

The Indirect Lending Program was initially run through an auto brokerage firm

called Aimbridge.  (Testimony of D. Ferraro, Doc. # 140 at 51.)  In 2003, in order to take

more control of the program, the credit unions bought the program from Aimbridge and

vested it in an entity the Credit Union Consortium had created called the Credit Union

Indirect Lending Association ("CUILA").  (Testimony of D. Ferraro, Doc. # 140 at 51-52;

Doc. # 146, ¶ 31.)  The credit unions bought shares in CUILA commensurate with their

historic use of the Indirect Lending Program.  Bellco's ownership interest initially

8

amounted to 37%, and remains around 38% today.  (Testimony of D. Ferraro, Doc. # 140 at 52-53.)  CUILA chose Minnesota Life – the same provider Bellco used for its Direct Lending Program – to insure the indirect loans.  (Testimony of D. Ferraro, Doc. # 140 at 55.)

Unlike Credit Insurance on direct loans, where borrowers paid monthly premiums, Colorado regulations required that automobile dealers selling Credit Insurance on indirect loans offer it as a "single premium" product.  (Doc. # 146, ¶ 32; Testimony of S. Jentz, Doc. # 142 at 366.)  With single premium insurance, borrowers made one lump sum premium payment at the time the loan was initiated.  (Doc. # 146, ¶ 32.)  Although a member could pay this one-time premium out of pocket, most rolled it in to the financing of the loan.  (Testimony of D. Ferraro, Doc. # 140 at 61.)  As a result of this system, single premium insurance was more expensive than monthly declining premium insurance sold through the Direct Lending Program.  (Doc. # 146, ¶ 32; Testimony of B. Birnbaum, Doc. # 143 at 587.)

Bellco received a 4.5% commission on the total premiums paid on all Credit Insurance policies on Bellco loans sold through the Indirect Lending Program.  (Doc. # 146, ¶ 33.)  The parties do not dispute that the dealerships who sold Credit Insurance on indirect loans were motivated by profit.  (Doc. # 146, ¶ 32.)

c.    CUILA Profit Share

Bellco's final source of Credit Insurance income came directly from CUILA.  (Doc. # 146, ¶ 34.)  Because of its ownership interest, Bellco received a distributive share of CUILA's profits.  (Testimony of C. Koth, Doc. # 141 at 315-17.)  CUILA's profits included a 10% commission for the sale of Credit Insurance on indirect loans to members of any

CUILA-affiliated credit union.  (Testimony of S. Jentz, Doc. # 142 at 369.)  But this commission was not CUILA's only income source.  The bulk of its income came from loan processing fees paid by credit unions, and CUILA also may have earned investment income.  (Testimony of D. Ferraro, Doc. # 140 at 103-04.)

       d.    <u>Undefined Income</u>

Bellco's records are not always clear on the amount of income attributable to these various streams.  For the year 2000, Bellco's records show the aggregate total of Credit Insurance income but, due to a loss of data in a computer system conversion, do not show the detail of the income's component sources.  (Testimony of C. Koth, Doc. # 141 at 341.)  It is possible that there were sources of revenue other than those discussed above that accounted for part of the year 2000 income.  (Testimony of C. Koth, Doc. # 141 at 341.)  Due to the same system conversion, Bellco also cannot account for the source of about $50,000 of its $500,000 in Credit Insurance income for the year 2001.  (Testimony of C. Koth, Doc. # 141 at 342; Trial Ex. 151.)

       3.    <u>Benefits of Credit Insurance</u>

Credit Insurance gives the insured peace of mind.  In the case of credit life insurance, the insured knows that the debt will die with the debtor and that any collateral will be released to the family.  (Testimony of D. Ferraro, Doc. # 140 at 35; Doc. # 146, ¶ 29.)  In the case of credit disability insurance, there is the security of knowing that, if the insured becomes disabled, she will not lose her car or house and will not be burdened by the loan.  (Testimony of D. Ferraro, Doc. # 140 at 35.)

Credit Insurance also provides some benefit to the credit union itself.  The primary function of Credit Insurance is to ensure that the loan gets paid.  (Testimony

of D. Ferraro, Doc. # 140 at 35; Testimony of S. Brayman.)  If, on the other hand, a loan is not insured and has to be written off, Bellco's earnings or capital must be used to make up for the shortfall.  (Testimony of D. Ferraro, Doc. # 140 at 35.)  In addition, if a loan is covered by Credit Insurance, the credit union avoids the costs and "unpleasant circumstances" of collecting on that loan in the event of death or disability of the borrowing credit union member.  (Testimony of G. Karels, Doc. # 142 at 530-31; Testimony of B. Birnbaum, Doc. # 143 at 588.)  As even the government's experts conceded at trial, Credit Insurance could reduce the credit union's risk of loss. (Testimony of G. Karels, Doc. # 142 at 522; Testimony of B. Birnbaum, Doc. # 143 at 588.)

Over the years, Minnesota Life paid out hundreds of thousands of dollars in credit life and disability claims.  (Testimony of M. Hullsiek, Doc. # 141 at 246.)  Even so, the precise fiscal benefit to Bellco was not established at trial.  That is, Bellco could not quantify how many loans would have gone bad – and would not have been paid by family members or covered by collateral – had they not been insured.  (Testimony of D. Ferraro, Doc. # 140 at 37.)

Moreover, numerous non-insurable events also lead to loans not being paid. (Testimony of D. Ferraro, Doc. # 140 at 37; Testimony of G. Karels, Doc. # 142 at 523-24; Testimony of R. Bruhn; Trial Ex. 85.)  Indeed, between 2002 and 2004, the three most common reasons that a Bellco loan became delinquent were job loss, illness or medical bills, and divorce.  (Testimony of R. Bruhn; Testimony of J. Ruby.)  Perhaps as a result, the total payout from Credit Insurance in 2003 was only 2% of the loan write-

offs for that year.  (Testimony of G. Karels, Doc. # 142 at 526.)  This amounted to about $300,000 in Credit Insurance payments.  (Testimony of G. Karels, Doc. # 142 at 530.)

Bellco presented anecdotal testimony of one member's experience with credit life insurance.  The member's husband passed away with an outstanding balance on a Bellco auto loan, which was paid off by the insurance policy.  While she might have been able to make the monthly payments by dipping into her savings account, it would have been a "great deal harder" without the insurance.  (Testimony of J. Lechman.) The Court finds this testimony supports Bellco's claim that Credit Insurance can have real benefits for its members.

4.      Loss Ratios and Premium Costs

Two key metrics relevant to Credit Insurance are the premium – the amount charged per $1,000 of insurance coverage – and the loss ratio – the amount of claims incurred divided by the amount of premiums earned.  In Colorado, financial institutions other than credit unions are permitted to charge a so-called "prima facie" premium rate for Credit Insurance rather than worry about their loss ratio.  (Testimony of M. Hullsiek, Doc. # 141 at 254-55.)  Credit unions, on the other hand, are governed by the loss ratio and are expected to keep that ratio at 40% or higher, i.e., $0.40 or more paid out for every $1 collected.[3]  (Testimony of M. Hullsiek, Doc. # 141 at 255.)

The prima facie rate is set by the Colorado Department of Insurance. (Testimony of M. Hullsiek, Doc. # 141 at 254; Testimony of M. Medland, Doc. # 142

---

[3]   Minnesota Life reported loss ratios in the aggregate for all of its customers rather than the loss ratio of Bellco specifically. (Testimony of M. Hullsiek (Doc. # 141) at 255-56; Testimony of S. Jentz (Doc. # 142) at 372-73.)  Even so, the evidence and testimony at trial showed that Minnesota Life was concerned with keeping *Bellco's* loss ratio at or above the 40% level.

at 446-47.)  During the period in question, the prima facie rate for individual credit life insurance in Colorado was $0.59 per $1,000 of coverage.  (Trial Ex. 163.)  Banks may only exceed this prima facie rate if they can establish that their loss ratio, at the higher rate, would remain above 40%.  (Testimony of M. Medland, Doc. # 142 at 448-49.)  However, because the prima facie rate is presumed to be reasonable, a bank could charge the prima facie rate even if it meant its resulting loss ratio would be dramatically below the 40% limit.  (Testimony of M. Medland, Doc. # 142 at 449.)

During the time period at issue in this litigation, Bellco charged a premium of $0.39 per $1,000 for individual coverage credit life insurance.  (Testimony of M. Hullsiek, Doc. # 141 at 240; Trial Ex. 50.)  In other words, if a member had a $10,000 balance on a covered loan, her monthly premium payment would be $3.90.  For a joint credit life policy – one that covered both spouses, for example – the premium was $0.62 per $1,000.  (Testimony of M. Hullsiek, Doc. # 141 at 240; Trial Ex. 50.)  For credit disability insurance, the premium ranged from $1.15 to $1.29 per $1,000.  (Testimony of M. Hullsiek, Doc. # 141 at 240, 244; Trial Ex. 50.)

These rates compared to a prima facie rate for individual credit life insurance – the premium that other financial institutions could charge – of $0.59 per $1,000.  (Trial Ex. 163.)  In other words, Bellco members paid $0.20 less per $1,000 for the same type of coverage.  Bellco's rates for joint life and credit disability were similarly below the prima facie rates.  (Testimony of M. Medland, Doc. # 142 at 449-51.)  Bellco had one of the lowest rate structures of Minnesota Life's more than 500 credit union clients. (Testimony of M. Hullsiek, Doc. # 141 at 301; Testimony of S. Jentz, Doc. # 142 at 357-58.)

Despite these low premiums, Bellco's loss ratio during the tax years in question hovered below the 40% threshold.  In 2000, Bellco had a loss ratio of 42% for credit life and 28% for credit disability, for a combined ratio of 33%.  (Trial Ex. 107.)  In 2001, those rates were 56% (life), 27% (disability), and 38% (combined).  (Trial Ex. 107.)  And in 2003, the rates were 41% (life), 7% (disability) and 20% (combined).  (Trial Ex. 107.)

Because an insurance company cannot know at the beginning of any given year how many claims will be made or paid, the loss ratio is calculated retrospectively.  (Testimony of M. Hullsiek, Doc. # 141 at 253; Testimony of D. Ferraro, Doc. # 140 at 133.)  If there were no fluctuations in claims, an insurer's historic experience would be a perfect predictor of claims going forward.  In that case, it would be simple to set premium rates to achieve a given loss ratio.  (Testimony of M. Hullsiek, Doc. # 141 at 256.)  However, given the reality of volatility in claims, it is difficult to predict what will occur in future years.  (Testimony of M. Hullsiek, Doc. # 141 at 256.)

Bellco's own experience shows the potential for drastic variance in loss ratios.  In the three years following the time period relevant to this litigation, the combined loss ratio first jumped to 62% (2004), then fell slightly to 52% (2005), and finally dropped dramatically to only 6% (portion of 2006).  (Trial Ex. 107.)  These years saw specific loss ratios ranging from a low of 2% for credit disability insurance in 2006 to a high of 86% for credit disability insurance in 2004.  (Trial Ex. 107.)

Because the loss ratio compares claims paid to premiums collected, changing the premium rates and insurance benefits impacts the ratio.  By offering more generous benefits, the number of qualifying claims will increase.  Similarly, by lowering rates, premiums collected will necessarily decline. (Testimony of M. Hullsiek, Doc. # 141

14

at 279.)  As a result, many of Bellco's positive adjustments to rates and benefits – such as changing from a 30-day non-retro benefit to a 14-day retro benefit – were made to try to get the loss ratio back up to the 40% limit.  (Testimony of M. Hullsiek, Doc. # 141 at 275-78.)  Put another way, Bellco was essentially required to keep its low premium rates in order to satisfy the 40% requirement.  (Depo. Testimony of P. Haught at 119:6-19.)

Bellco considered moving (and eventually did move) to a so-called "debt cancellation" product, which is similar to Credit Insurance but not regulated as a such, in part to avoid the regulatory burdens of complying with the 40% loss ratio.  (Testimony of S. Jentz, Doc. # 142 at 393-97, 415; Trial Ex. 84.)  However, other than the regulatory compliance concerns expressed by Minnesota Life, Bellco never had any issues with the 40% loss ratio.  (Testimony of S. Jentz, Doc. # 142 at 415.)

**D.   ACCIDENTAL DEATH & DISMEMBERMENT INSURANCE**

1.   <u>General Background on Accidental Death & Dismemberment Insurance</u>

As is obvious from the name, Accidental Death & Dismemberment Insurance ("AD&D") is a cash benefit payable upon the death or dismemberment, by accident, of the insured.  (Doc. # 146, ¶ 35.)  Bellco operated its AD&D program through a company called Affinion Benefits Group.  (Trial Exs. 38, 39, 119.)   As part of the AD&D program, Bellco provided $1,000 in "free" AD&D coverage to any member who asked for it. (Doc. # 146, ¶¶ 37, 50.)  Bellco paid the premium for that initial coverage.  (Doc. # 146, ¶¶ 37, 50.)  Additional, supplemental coverage was offered at a rate of $1 per month per $10,000 of individual coverage, and $1.50 per month per $10,000 of family coverage. (Doc. # 146, ¶ 50.)

2.    Bellco's Involvement In the AD&D Program

The relationship between Bellco and Affinion was governed by Affinion's standard marketing agreements.  (Trial Exs. 36, 37, 38, 39, 119; Testimony of D. Ferraro, Doc. # 140 at 72.)  Bellco did not negotiate the terms of these agreements, but simply accepted them as offered.  (Testimony of D. Ferraro, Doc. # 140 at 72-73.)

Under the terms of the Joint Marketing Agreement[4] in place as of 2002, Affinion was required to "direct [the] marketing strategy and plan" of the AD&D program, "bear all costs and expenses related to marketing and provision" of the AD&D program, and perform any other agreed upon duties.  (Trial Ex. 119.)  Bellco's responsibilities under the agreement appear similarly broad.  For example, Bellco was required to "[p]rovide all relevant marketing information necessary for the development of an effective direct marketing strategy" and "[a]uthorize and coordinate" the mailings "as mutually agreed upon by the parties."  (Trial Ex. 119.)  However, as Kimberly Arvizu, Affinion's vice president for client services, explained at trial, Bellco's actual responsibilities were much more limited.[5]  The first requirement simply meant that Bellco was to provide its member mailing list, and the second requirement obligated Bellco to review the marketing materials and agree on the mailing date.  (Testimony of K. Arvizu, Doc. # 141 at 171-72.)  The AD&D operation was described as a "turn key operation," meaning that the

---

[4]   This agreement was deemed a "joint marketing agreement" in order to comply with federal privacy laws.  (Testimony of K. Arvizu (Doc. # 141) at 159.)

[5]   The government challenges the credibility of Ms. Arvizu's testimony, as she only supervised the group working with credit unions and did not interact with Bellco directly. However, the Court finds that Ms. Arvizu can credibly testify as to the structure of the AD&D program generally, as she did at trial, given her involvement with that program at Affinion.

bulk of the work was done by Affinion, not Bellco.  (Testimony of K. Arvizu, Doc. # 141 at 180; Testimony of S. Jentz, Doc. # 142 at 383.)

The AD&D program was marketed to Bellco's members by way of a direct mailing.  (Doc. # 146, ¶ 38.)  Affinion paid for this mailing and the related promotional materials.  (Doc. # 146, ¶ 41.)  Each solicitation included a letter sent under the signature of Bellco's chief executive and bearing Bellco's logo.  (Doc. # 146, ¶ 54.) However, Affinion's telephone number was listed as the contact number on the mailings.  (Doc. # 146, ¶ 46.)

Bellco also promoted the AD&D product in its branches.  Promotional materials such as buttons, balloons and banners – provided by Affinion – were put in branch lobbies.  (Depo. Testimony of P. Haught at 36:4-16.)  The materials did not remain indefinitely, but were usually put up at the same time the mailings went out.  (Depo. Testimony of P. Haught at 36:4-16.)

Before each mailing was sent, Bellco's employees edited and approved the materials; no solicitation went out without Bellco's permission.  (Doc. # 146, ¶ 53.)  The promotional letter was written by Affinion but reviewed by Bellco for "tone and content." As Doug Ferraro, Bellco's CEO, testified at trial, Bellco was "interested in protecting our brand.  We have a style in which we communicate with our members.  So anything that is going to go to our members, we want to make sure that it complies with generally how we would communicate with our members."  (Testimony of D. Ferraro, Doc. # 140 at 74.)  This point was confirmed by Sandra Sagehorn-Elliot, Bellco's vice president for customer relationship management, who noted that Bellco wanted to ensure that the tone was not too "salesy."  (Testimony of S. Sagehorn-Elliot, Doc. # 141 at 195-96.)

17

Once the letter was approved, Affinion coordinated the mailing.  (Testimony of K. Arvizu, Doc. # 141 at 157.)

In anticipation of each solicitation, Bellco created lists of members to whom the solicitation was to be sent, using criteria established by Affinion.  (Doc. # 146, ¶ 52.) This list was given a "basic scrubbing" to remove members' private information, comply with privacy rules, and ensure that members on the "do not call" list were not contacted. (Doc. # 146, ¶ 40; Testimony of D. Ferraro, Doc. # 140 at 79-80.)  The scrub was consistent with Bellco's privacy statement that it would control its members' information if ever that information was sold to a third party.  (Testimony of D. Ferraro, Doc. # 140 at 80.)

Further, in order to comply with federal privacy regulations, Bellco signed contracts with two service providers, InfoUSA and EDS, to handle certain data processing and billing tasks.  (Trial Exs. 120, 121.)   Although the contracts were between Bellco and these service providers, Affinion, not Bellco, actually paid for the services.  (Testimony of K. Arvizu, Doc. # 141 at 155-56; Testimony of S. Jentz, Doc. # 142 at 378; Depo. Testimony of P. Haught at 51:13-25.)

If a Bellco member wished to elect AD&D coverage, she would fill out the form included in the solicitation materials.  (Testimony of K. Arvizu, Doc. # 141 at 169; Trial Ex. 70.)  A Bellco member could opt in to the $1,000 coverage by returning the form to a Bellco branch, but had to mail the form to Affinion directly in order to select additional coverage.  (Testimony of K. Arvizu, Doc. # 141 at 181.)  Affinion processed the member's application, reviewed it for correctness, and decided whether to extend coverage to the applicant.  (Doc. # 146, ¶ 42.)  If the member's application was

accepted, Affinion would issue the certificate of insurance.  (Doc. # 146, ¶ 43.)  Affinion would process any claims for AD&D; Bellco had no involvement in that function.  (Doc. # 146, ¶ 45.)

The Bellco/Affinion agreement required Bellco to "[b]ill and collect Program premium quarterly."  (Trial Ex. 119.)  Bellco did this through an electronic Automated Clearing House ("ACH") program, which automatically deducted the premium from a member's checking account.  (Testimony of D. Ferraro, Doc. # 140 at 77; Testimony of S. Jentz, Doc. # 142 at 381; Doc. # 146 ¶ 44.)  Bellco processed AD&D premiums the same way it would other ACH debits, such as if a member signed up to have her monthly phone bill deducted from her checking account.  (Testimony of D. Ferraro, Doc. # 140 at 77.)  Bellco was also responsible for flagging member accounts that had insufficient funds to pay the premiums.  (Depo. Testimony of P. Haught at 31:4-7.)  Even so, it was Affinion that actually mailed any "insufficient funds" notices.  (Depo. Testimony of P. Haught at 78:8-17.)

The solicitation materials directed members to contact Affinion.  (Depo. Testimony of P. Haught at 29:12-15.)  However, because many members viewed Bellco as their primary source of information, Bellco often fielded calls and questions from members who had received the mailings.  (Depo. Testimony of P. Haught at 29:19-23; Testimony of S. Sagehorn-Elliot, Doc. # 141 at 206.)  In order to be prepared to answer members' questions about a product offer it had endorsed, Bellco made sure to educate its call center on the AD&D program.[6]  (Testimony of S. Sagehorn-Elliot, Doc. # 141 at

---

[6]   The call center was essentially Bellco's customer service center, with employees answering all types of customer inquiries.

197, 213-14.)  Call center employees would get a copy of the solicitation letter along with a fact sheet prepared by Affinion.  (Testimony of S. Sagehorn-Elliot, Doc. # 141 at 197, 207-08; Trial Ex. 100.)  The fact sheet contained extensive details about the AD&D program.  (Trial Ex. 100.)  However, Bellco executives testified at trial that call center employees did not give anything more than basic information to members.  While they would assure members the AD&D solicitation was a legitimate offer, confirm that they could get $1,000 in protection for free, and answer some basic questions about coverage, all other questions were referred to Affinion.  (Testimony of S. Sagehorn-Elliot, Doc. # 141 at 198, 212.)  Bellco did no actual sales or marketing of the AD&D product.  (Testimony of D. Ferraro, Doc. # 140 at 76, 122; Testimony of S. Sagehorn-Elliot, Doc. # 141 at 198-99.)

3.      Hours Logged By Bellco On The AD&D Program

Bellco's tax records indicate that it spent 683 hours on the AD&D program in 2003.  (Trial Ex. 79.)  These hours, however, were not recorded contemporaneously.  Rather, after the IRS notified Bellco in 2007 that it would have to re-calculate its earlier tax filings, Bellco set out to determine how much time employees had spent on various UBIT products, including AD&D.  (Testimony of C. Koth, Doc. # 141 at 317.)  Bellco surveyed various managers, asking them to do their best to reconstruct the time their employees had spent on the product in a given tax year.  (Testimony of C. Koth, (Doc. # 141 at 317-18; Testimony of D. Ferraro, Doc. # 140 at 119; Trial Exs. 90, 92.)  There were, obviously, challenges in recreating this time.  (Testimony of R. Bruhn.)

Bellco also estimated the time that its top executives spent on the UBIT products.  More specifically, Bellco estimated the aggregate amount of time spent on all activities

on which UBIT might be due, and then Bellco's finance staff allocated that time between the various products.  (Testimony of D. Ferraro, Doc. # 140 at 122; Testimony of C. Koth, Doc. # 141 at 329-335.)  Of the seven UBIT products, the aggregate time was allocated as follows: half was charged to member financial management, and the other half was divided equally among the six remaining products.  (Testimony of C. Koth, Doc. # 141 at 331; Testimony of R. Bruhn.)

Of the 683 hours, approximately 150 were attributed to Bellco executives using this estimating methodology.  Finance and accounting reported another 17 hours processing commission checks, working on budgets, and doing other basic accounting tasks.  (Trial Ex. 79; Testimony of C. Koth, Doc. # 141 at 322-23.)  There were two hours reported for "payment systems," which was essentially time spent reconciling any issues with the ACH payments discussed above.  (Trial Ex. 79; Testimony of C. Koth, Doc. # 140 at 324-25.)  Thirty-six hours were reported for training new employees on the differences between AD&D and Credit Insurance.  (Trial Ex. 79; Testimony of C. Koth, Doc. # 140 at 328-29.)  The vast majority of the hours – 480 – were attributed to the Bellco call center.  (Trial Ex. 79.)  As discussed above, the call center fielded all queries from Bellco members, including calls about the AD&D product.

Bellco was paid in two different ways for its participation in the AD&D program.  First, it received an "administrative allowance."  (Trial Ex. 119.)  The administrative allowance was a 30% commission on the total premiums of members who elected to purchase coverage over and above the "free" $1,000 coverage.  (Testimony of D. Ferraro, Doc. # 140 at 78; Testimony of K. Arvizu, Doc. # 141 at 175.)  Logistically, however, Bellco did not receive the full 30%.  Rather, before the commission was

21

remitted to Bellco, Affinion deducted the premiums Bellco owed for the members who elected the $1,000 coverage. (Testimony of K. Arvizu, Doc. # 141 at 176; Testimony of D. Ferraro, Doc. # 140 at 76.)  In other words, payment to Bellco was a net payment of the 30% minus Bellco's premium obligation.  This "administrative allowance" was paid quarterly.

Bellco was also paid a "marketing bonus." (Trial Ex. 119.)  Notwithstanding the name, this was nothing more than an incentive payment made to Bellco for renewing its exclusive contract with Affinion.  (Testimony of K. Arvizu, Doc. # 141 at 177; Testimony of D. Ferraro, Doc. # 140 at 79.)  During the relevant time frame, this bonus equaled $275,000, paid in installments.  (Testimony of K. Arvizu, Doc. # 141 at 179; Testimony of C. Koth, Doc. # 141 at 335-37.)

## II.   CONCLUSIONS OF LAW

The question in this case is whether all or part of Bellco's Credit Insurance and AD&D income is subject to UBIT.  The taxation of income unrelated to an exempt organization's basic purposes dates from the Revenue Act of 1950, which was "enacted in response to perceived abuses of the tax laws by tax-exempt organizations that engaged in profit-making activities." *United States v. Am. Coll. of Physicians*, 475 U.S. 834, 837 (1986).  The Act ratcheted up the prior requirement that income need only be *used* in furtherance of the entities' tax-exempt purposes, shifting the focus to whether the income was *derived* from activities related to those purposes.  *Id.* at 837-38.  The Act, therefore, "struck a balance between its two objectives of encouraging benevolent enterprise and restraining unfair competition by imposing a tax on the 'unrelated business taxable income' of tax-exempt organizations."  *Id.* at 838.

Income may be shielded from UBIT in several ways.  Of particular relevance to the instant case, income that is "substantially related" to Bellco's purposes, along with "royalties" income, both escape taxation.  26 U.S.C. §§ 512(b)(2), 513.  Bellco argues that its Credit Insurance income is exempt from UBIT under the former test, and its AD&D income exempt under the latter.  The Court considers each issue in turn, keeping in mind that, as a taxpayer suing for a return of taxes paid, Bellco bears the burden of demonstrating its entitlement to a refund.  *Dye v. United States*, 121 F.3d 1399, 1408 (10th Cir. 1997) (citing *United States v. Janis*, 428 U.S. 433, 440 (1976)).

## A.    CREDIT LIFE AND DISABILITY INSURANCE

The Internal Revenue Code (the "Code") assesses UBIT on income "from any unrelated trade or business."  26 U.S.C. § 512(a)(1).  "Unrelated trade of business" is a

> trade or business the conduct of which is not **substantially related** (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 . . . .

*Id.* § 513(a) (emphasis added).  Under the Code, then, whether Bellco's Credit Insurance income is taxable depends on (1) whether the activities generating Credit Insurance income constitute a "trade or business," (2) whether those activities are "regularly carried on," and (3) whether the activities are "substantially related" to Bellco's purposes.  *Am. Coll. of Physicians*, 475 U.S. at 838-39; *see also* 26 U.S.C. § 512. The parties do not dispute that the activities were business activities regularly carried on.  The key issue in the instant case is whether the "substantially related" test is met.

The relevant regulations define "substantially related" to mean that the conduct of the business activities in question has a "causal relationship to the achievement of

23

exempt purposes (other than through the production of income)," and that this causal

relationship be a "substantial one." 26 C.F.R. § 1.513-1(d)(2). This means that "the

performance of the services from which the gross income is derived must contribute

importantly to the accomplishment of those purposes." *Id.* The analysis "necessitates

an examination of the relationship between the business activities which generate the

particular income in question – the activities, that is, of producing or distributing the

goods or performing the services involved – and the accomplishment of the

organization's exempt purposes." *Id.* at § 1.513-1(d)(1). This assessment "depends in

each case upon the facts and circumstances involved." *Id.* at § 1.513-1(d)(2).

The parties have stipulated that Bellco's tax-exempt purposes are twofold:

promoting thrift among its members (the "thrift" function) and creating a source of credit

for them at fair and reasonable rates of interest (the "lending" function). (Doc. # 146,

¶ 10.) The question, then, is whether the various activities generating Credit Insurance

income – the Direct Lending Program, the Indirect Lending Program, and the CUILA

profit sharing – contribute importantly to the accomplishment of at least one of these two

goals.

1.    <u>Direct Loans</u>

Bellco argues that the Direct Lending Program is substantially related to both its

lending and thrift functions. While the Court is skeptical on the former point, it agrees

with Bellco on the latter.

As to lending, Bellco argues that Credit Insurance is "inseparably" tied to the

specific terms of the loan. (Doc. # 148 at 9.) That is, the terms of the insurance

correlate to the loan balance, the length of the coverage relates to the length of the

loan, and the member can only purchase the insurance at the time the loan is made. (*Id.* at 9-10.)  However, the question is not whether the insurance product is related to the loan, it is whether the product is related to making the loan **at fair and reasonable rates**.  It is not clear to the Court, from the evidence presented at trial, how the mere fact that the insurance is linked to the loan assists Bellco in making the loan on good terms for members.

Bellco also argues that the insurance reduces loan collection costs and avoids forcing Bellco to make up for "bad loans" by taking from earnings or capital.  (Doc. # 148 at 10, 12.)  Thus, Bellco contends, Credit Insurance helps preserve capital, which helps Bellco make more loans.  But this argument is little more than a claim that Bellco used Credit Insurance income to offer loans on better terms.  The regulations expressly bar such a claim – that income is substantially related simply because the income itself, rather than the activity generating it, is used for the organization's exempt purposes.

Finally, Bellco argues that Credit Insurance contributes to the lending function because it eases the member's burden to repay loans in the event of death or disability. (Doc. # 148 at 10.)  This argument carries some weight.  Making loans at fair rates could include the broader idea of making loans on good terms, including offering a debt-forgiveness insurance option.  It is not obvious, however, whether this argument carries enough weight to satisfy Bellco's burden.  But the Court need not decide the issue, because the Court concludes that Bellco has met its burden to show that Credit Insurance is clearly and substantially related to promoting member thrift.

In the banking and credit union context, the concept of thrift is tied to sound financial management.  *See* Merriam-Webster's Collegiate Dictionary 1302 (11th ed.) (defining "thrift" to include "careful management esp. of money").  Credit Insurance does just that.  It permits a borrower to guard against certain difficult circumstances and to know that, if the unfortunate event of death or a serious disability occurs, the borrower's family and/or assets would be protected.  For a relatively marginal payment, the borrower buys peace of mind.

This concept was confirmed at trial by the testimony of the Bellco member whose deceased husband's auto loan was satisfied by credit life insurance.  While she might have been able to pay the loan and keep the car despite the loss of her husband, it would have been a "great deal harder" without the insurance.  (Testimony of J. Lechman.)  Moreover, because the insurance is offered at the time of, and in conjunction with, the loan, the borrower has easier access to insurance coverage.  Further, the qualification criteria for this type of coverage is not as stringent as the qualification criteria generally imposed for individual term life or disability policies.  Finally, Bellco's premiums were lower for this insurance coverage, often by a substantial margin, than those charged by other financial institutions.  Giving members a convenient way to purchase insurance that protects them, their families, and their assets in the event of a catastrophic event certainly qualifies as a mechanism for careful management of the borrower's money.

None of the government's arguments convince the Court otherwise.  The government's basic theory is that Credit Insurance is a "bad deal" and thus cannot promote thrift.  The government focuses on Bellco's loss ratio, noting that it was below

the 40% threshold for the tax years in question.  (Doc. # 147 at 6-7.)  However, although the Court appreciates that the state of Colorado has selected the loss ratio as the relevant metric for regulating Credit Insurance, the Court does not concur with the proposition that the loss ratio a good measure, much less the best measure, of whether the product promotes thrift.  The government argues that the low loss ratio shows that "Credit Insurance was sold to people who did not **need** it."  (*Id.* at 7 (emphasis added).)  The Court disagrees.  A low loss ratio simply indicates that the insurance product was purchased by people who had not **used** it – yet.  The loss ratio is a retrospective calculation that looks at how many people in a given year died or became disabled.  There was no evidence at trial that Bellco somehow targeted only those people it expected not to make claims on the policy, *i.e.*, those who would not "need" insurance, in order to drive its loss ratio down.  Indeed, the evidence suggests the opposite.  The Credit Insurance offered by Bellco did not require submission of lengthy health questionnaires or submission to health examinations that are used by other companies to increase premiums for or exclude applicants who are viewed by the insurers as the greatest risks.

Moreover, Bellco's loss ratio varied wildly in the years 2000-2006, from a low of 2% to a high of 86%.  This fluctuation suggests that, although Bellco's loss ratio was below (but near) 40% for 2000, 2001, and 2003, that loss ratio could just as easily be a statistical anomaly as a plot to maximize profits.  Indeed, the inherent uncertainties of such fluctuations demonstrate why basing taxability on the loss ratio is an unsatisfactory solution.  It cannot be that Credit Insurance sold at the same price

and with the same benefits is a product that promotes thrift when claims are high but not when claims are low.  Nor is it workable to say that businesses must wait for all of the insurance claims to come in before they discover whether their insurance income was taxable in that year.  In short, nothing about the low loss ratio, standing alone, convinces the Court that Credit Insurance cannot be – and was not – substantially related to Bellco's thrift function.

The government also advances a slightly different loss ratio/thrift argument that is, admittedly, more compelling.  Specifically, the government claims that Bellco's products were "relatively" overpriced.  A low loss ratio, argues the government, indicates that Bellco had room to lower premiums, which would raise the loss ratio and, as a result, would offer Credit Insurance at an even lower cost to members.  (Doc. # 147 at 7-8.)  However, it is not the province of this Court to second-guess the business decisions of Bellco.  That Bellco might have offered its customers a *better* value, in terms of insurance coverage for an even lower premium, does not mean that Credit Insurance was a bad deal or did not promote thrift.  It is undisputed that Bellco members were still paying substantially less for Credit Insurance than they would have at other financial institutions.  The evidence shows that Bellco's rates declined, and its benefits increased, over the relevant time period.  Further, the drastic fluctuation in loss ratios, noted above, suggests that Bellco exercised reasonable business judgment by not lowering premiums too much and thus running the risk of having to raise them dramatically, if and when the loss ratio increased.

The Court also notes that the government's leading proponent of this theory that Bellco's products were "relatively" overpriced was its expert witness, Birny Birnbaum.

28

However, Mr. Birnbaum admitted that this relative overpricing was not really critical to his opinion, because he believed that Credit Insurance could *never* promote thrift. (Testimony of B. Birnbaum, Doc. # 143 at 638 ("Well, I don't think that – I don't think credit insurance, no matter what the loss ratio was, the sale of credit insurance isn't – can't promote thrift, can't promote frugality or the wise management of your finances."). This concession calls into question the credibility of his assessment that Bellco's products were *over*priced, as he would not have considered the price reasonable at **any** cost or loss ratio.  The Court's conclusion that the Credit Insurance is substantially related to Bellco's thrift function is not undercut by the mere fact that Bellco failed to reduce its premium rates.[7]

Finally, the government argues that Bellco's Direct Lending Program was "primarily motivated" by a desire to make a profit, thus, disqualifying the resulting income from the UBIT exemption.  (Doc. # 147 at 8-12.)  Bellco, arguing that the cases assessing profit motive involve distinguishable tax-exempt entities, asserts that profit motivation is simply not relevant to the inquiry.  (Doc. # 148 at 35-36.)  The Court need not resolve this dispute because, even assuming that the "primary motivation" test applies, it is not met here.

---

[7]   On this point, the Court agrees with the assessment offered by the court in *Community First Credit Union v. United States*, No. 08-C-57, 2009 WL 2058476 (E.D. Wisc. July 14, 2009), a recent credit union UBIT case involving many of the same players as this litigation. In upholding the jury's determination that Credit Insurance was substantially related to the thrift function of a credit union, the court observed that "[t]he government's analysis suggested that the price of the insurance was too rich, but the fact that the products could have been cheaper does not mean they did not encourage thrift – the government never pointed to any authority that says 'thrift' means always paying a rock-bottom price and nothing else."  *Id.* at *1.

Bellco concedes that it has a motive to make a profit on its lending functions in order to pay interest on deposits and offer loans at a reasonable cost.  (Doc. # 148 at 32-33.)  However, the evidence does not show that profit was the *primary* motivation in offering Credit Insurance.  It is true, as the government points out, that Bellco switched insurance providers from CUNA Mutual to Minnesota Life and that, as a result, the program became more profitable.  (Doc. # 147 at 10-11.)  However, the circumstances surrounding the change in insurance providers do not indicate that profit was the primary motivator for Bellco's decision to switch.  This change was made primarily to avoid a proposed *increase* in premiums to Bellco members, to get an even lower premium rate for Bellco members, and to expand the insurance program's availability to more Bellco members.

The government also argues that Minnesota Life was "administering the program to generate loss ratios no higher than the State mandated minimum of 40%." (Doc. # 147 at 11.)  The Court disagrees.  While the evidence shows that Minnesota Life was working to get the loss ratio back up to the 40% limit, it does not show that Bellco (or Minnesota Life) was attempting to keep the loss ratio from rising above that limit.  Further, as discussed above, calibrating the loss ratio to the 40% limit makes sense in light of the significant fluctuations that Bellco saw during the years in question.  Minnesota Life's reduction of rates and increase in benefits in order to comply with Colorado's regulatory requirements does not demonstrate that Bellco's primary motive in offering Credit Insurance was to raise revenue.

In short, considering all of the facts and circumstances, the Court finds that Bellco has met its burden to show that its provision of Credit Insurance though its Direct

Lending Program contributes importantly to its tax-exempt purpose of promoting member thrift. For that reason, the income from the Direct Lending Program is not subject to UBIT.

2.    Indirect Loans

Credit Insurance sold through the Indirect Lending Program functions in a nearly identical manner as that offered through the Direct Lending Program. Thus, the Court's conclusions regarding how such insurance promotes thrift in the direct loan context – by protecting assets, allowing for convenience of purchase, and giving peace of mind to credit union members – apply equally in the indirect loan context. The government focuses on two distinguishing facts: the Indirect Lending Program offered a "single premium" product which was more expensive than Credit Insurance sold through the Direct Lending Program; and the automobile dealerships that operated the Indirect Lending Program were, unlike Bellco, motivated purely by profit. (Doc. # 147 at 15.) Neither of these facts is sufficient to convince the Court that the Indirect Lending Program was not substantially related to Bellco's thrift function. Although the cost of Credit Insurance sold through the Indirect Lending Program may have been higher than Credit Insurance sold through the Direct Lending Program, borrowers still qualified for the insurance coverage with relative ease and they enjoyed the peace of mind that, in the event of their death or disability, their families would not be saddled with the unpaid loan debt. Moreover, although automobile dealers may have been driven by profit, there is no evidence that this motivation trickled down to Bellco. Indeed, one of the criteria that Bellco, through CUILA, imposed on dealerships is that they could not "mark up" members' loan rates to squeeze additional profits out of an automobile sale. For all

of these reasons, the Court finds that Credit Insurance sold through the Indirect Lending Program is substantially related to Bellco's thrift purpose.[8]

      3.    <u>CUILA Profit Share</u>

Bellco also seeks a refund of UBIT paid on income booked as Bellco's share of CUILA's Credit Insurance profits.  This income was reported to Bellco, by CUILA, as income related to the sale of Credit Insurance to all CUILA credit union members.  However, at trial, there was no testimony or other evidence to confirm that this income in fact related to Credit Insurance, as opposed to the other lines of business in which CUILA was involved.  Both Bellco's CEO, Douglas Ferraro, and Bellco's director of finance, Carol Koth, testified that a CUILA executive, Ed Small, provided the income information.  Mr. Small was not called as a witness, and there was no confirmation of how his income figures were derived.  Neither Mr. Ferraro nor Ms. Koth had personal knowledge of the calculations.  Without better evidence of what income was included in the CUILA numbers – and specifically confirmation that the income did not, intentionally or inadvertently, include other lines of CUILA's business – the Court finds that Bellco has not met its burden of demonstrating its entitlement to a refund on this issue.  *Cf. Jones v. Comm'r*, 903 F.2d 1301, 1303 (10th Cir. 1990) ("As a taxpayer, [plaintiff] has the duty to maintain adequate and accurate records to enable him to file a tax return.").

      4.    <u>Undefined Credit Insurance Income</u>

---

[8]   The government argues that Bellco failed to produce evidence of the terms, rates, and loss ratios of the Indirect Lending Program when it was administered by Aimbridge, rather than CUILA.  (Doc. # 147 at 14.)  However, the Court's finding of thrift does not depend on such details.  Rather, Credit Insurance is substantially related to Bellco's thrift purpose because it provides peace of mind and protection of assets – advantages borrowers got through both the Aimbridge and CUILA programs.

Finally, Bellco's tax returns booked certain income as Credit Insurance income in 2000 and 2001 but, because of a system conversion in early 2001, the details of that income no longer exist.  Carol Koth conceded at trial that it is possible that other revenue streams could have been included in these income numbers.  As with the CUILA profit share income, the Court finds that Bellco has not met its burden to show that this income was substantially related to its tax-exempt purposes.

## B.    ACCIDENTAL DEATH & DISMEMBERMENT INSURANCE

Bellco does not argue, as it did with respect to Credit Insurance, that AD&D insurance is substantially related to its thrift or lending function.  Rather, Bellco contends that, because Affinion paid for the rights to use Bellco's good name and solicit its members, the resulting AD&D income constitutes "royalties" under the Code.  The Code expressly excludes "all royalties" from the definition of unrelated business taxable income, i.e., royalty income is exempt from UBIT.  26 U.S.C. §§ 512(a)(1), (b)(2).

The term "royalties" is not defined in the Code.  The Court, therefore, "look[s] to the 'ordinary, everyday senses' of the word."  *Sierra Club, Inc. v. Comm'r*, 86 F.3d 1526, 1531 (9th Cir. 1996) (quoting *Comm'r v. Soliman*, 506 U.S. 168, 174 (1993)).  In shaping their arguments, both parties rely heavily on the Ninth Circuit's *Sierra Club* opinion – which provides a comprehensive analysis of the royalties issue. As the Ninth Circuit explained, the term "royalties"

> commonly refers to a payment made to the owner of property for permitting another to use the property.  The payment is typically a percentage of profits or a specified sum per item sold; the property is typically either an intangible property right – such as a patent, trademark, or copyright – or a right relating to the development of natural resources.

*Id.* The issue, then, is whether the income is a payment for passively permitting the use of some intangible property (such as Bellco's goodwill or its customer list), in which case the resultant income is a royalty, or, instead, payment for services rendered by the owner of such property, in which case it is not.

This is not, however, an "all-or-nothing proposition." *Oregon State Univ. Alumni Assoc., Inc. v. Comm'r*, 193 F.3d 1098, 1101 (9th Cir. 1999). That is, merely because income derives from some intangible product does not make it royalties if the provider of that product actively promoted or marketed the intangible. *Sierra Club*, 86 F.3d at 1534 (rejecting the argument that "Congress intended to exclude *all* royalty income from [UBIT], not simply royalty income passively derived") (emphasis in original). On the other hand, provision of some minimal service does not necessarily negate the exemption. *Oregon State Univ. Alumni Ass'n*, 193 F.3d at 1101. Importantly, "the owner of an intangible may engage in certain activities to exploit and protect the intangible which do not change the nature of the payment received." *Common Cause v. Comm'r*, 112 T.C. 332, 342 (Tax Ct. 1999). "The question is whether [the tax-exempt entity] did little enough work for the money they received to be royalties, . . . or whether they did too much, so that the money was taxable as unrelated business income." *Oregon State Univ. Alumni Ass'n*, 193 F.3d at 1099.

This balance makes particular sense when considering the reason royalties were likely excluded from UBIT. As noted above, Congress imposed UBIT in an attempt to restrict tax-exempt entities from abusing their exemptions and engaging in "full-fleged commercial enterprises in competition with corporations whose profits were fully

taxable." *Am. Coll. of Physicians*, 475 U.S. at 838.  As the Ninth Circuit explained – persuasively – in the *Oregon State* case,

> it is hard to think of a way that charities could unfairly compete with for-profit businesses with respect to royalties in the same way that they can in the sale of goods or services . . . .  But it is easy to see how a charity could compete with a mailing list or promotional services company, if the money a charity received was largely on account of its promotional services rather than the use of its name.

193 F.3d at 1101.  With these principles in mind, the Court turns to a consideration of the AD&D program and Bellco's income therefrom.  As with the issue of substantial relation, whether that income is considered "royalties" "shall be determined by all the facts and circumstances of each case."  26 C.F.R. § 1.512(b)-1.

The government focuses on the hours Bellco attributed to the AD&D program to argue that the AD&D income was really payment for services.  (Doc. # 147 at 18-20.) The Court acknowledges that expending 683 hours of labor does seem, at first blush, to be substantial.  Resolution of this issue is a close call, and Bellco's participation in the AD&D program nears crossing the line from passive sale of intangible information to active service and support.  But, given careful scrutiny, it is clear that much of Bellco's time was spent on activities intended to protect Bellco's goodwill with its members and its member privacy rather than to actively promote the AD&D program or otherwise perform administrative services for that program.  Thus, evaluating all of the evidence and considering all of the facts and circumstances, the Court finds that, although Bellco did perform some work in connection with the program, that work was focused on protecting its intangible assets and was sufficiently insubstantial, so as to result in the income appropriately being considered royalties.

The vast majority of the hours – 480 – were logged by Bellco's call center.[9]  This time was spent answering basic calls from members asking about the AD&D program. These calls were not contemplated by the Affinion/Bellco agreements, but rather were the incidental result of members' attempts to confirm the legitimacy of the solicitation. While call center employees were given a fact sheet that could, potentially, have been used to "sell" the AD&D program, numerous witnesses confirmed that call center employees did **not** engage in marketing of the program.  Quite the contrary, both the promotional mailings and the call center employees directed members to contact Affinion with any substantive questions.  In short, nothing in the evidence suggests that Affinion was paying Bellco for its call center's time or services.

Further, the primary tasks performed by Bellco – reviewing the mailing materials and producing the mailing list – fit into the category of protecting Bellco's goodwill and its relationship with its members rather than servicing the AD&D program.  Bellco edited the letter for tone and style to ensure that material going out under its name was consistent with its other member communications.  Bellco did not "manage" its mailing list the way a mail house or other service provider would; rather, it removed certain accounts for the purpose of honoring the privacy commitment made to its members. These steps to protect Bellco's intangible assets – its member information – do not change the nature of the AD&D income from royalties to taxable services.  *See Common Cause*, 112 T.C. at 342.

---

[9]   As stated previously, the call center is essentially Bellco's customer relations/service department.

The ACH billing that Bellco performed – debiting premiums from member accounts – does come a bit closer to being a "service" provided to support the AD&D program.  However, the evidence indicates that this process was, essentially, automatic and did not require much time or effort on Bellco's part.  Indeed, Bellco logged only two hours on ACH issues for the relevant tax year.  Even if this were a service provided by Bellco, this minimal service did not "taint[ ] all the royalties."  *Oregon State Univ. Alumni Ass'n*, 193 F.3d at 1101.

In sum, the Court finds that Affinion was paying Bellco for the use of its member lists and the goodwill associated with its name, rather than for list management or other administrative services.  Indeed, were Affinion paying for "services," Bellco's $200,000 in income would amount to nearly $300 per hour for, primarily, call center employees to field and refer queries.  It is unreasonable to assume that any business would pay such a rate, no matter the quality of the call center staff.  Bellco's AD&D income is properly categorized as royalties income and therefore exempt from UBIT.

### III.  CONCLUSION

For the foregoing reasons, it is ORDERED as follows:

1.    Plaintiff Bellco Credit Union **is not liable** for unrelated business income tax on its income from the Direct Lending Program and the Indirect Lending Program for tax year 2003 and the portion of tax year 2001 for which it has accurate income records;

2.      Plaintiff Bellco Credit Union **is not liable** for unrelated business income tax on its royalties income from Accidental Death and Dismemberment insurance;

3.      Because Bellco lacks accurate income records, Plaintiff Bellco Credit Union **is** liable for unrelated business income tax on its Credit Insurance income for tax year 2000 and a portion of tax year 2001; and

4.      Plaintiff Bellco Credit Union **is liable** for unrelated business income tax on its share of CUILA's profits.

The Court further ORDERS the parties to meet and confer with respect to the precise amount of the refund due to Bellco.  If the parties can reach agreement, the parties shall file a stipulation concerning the refund amount **within 60 days of the date of this Order**.  If the parties cannot reach agreement, Bellco shall submit its motion for entry of judgment, with supporting affidavits and other documents substantiating its refund request, **within 60 days of the date of this Order**.  The United States of America shall file any response **within 21 days of that filing**, and Bellco shall have **14 days to file any reply**.  The Court will review the filings and determine whether a further hearing is necessary.

DATED:  April   2  , 2010

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge

38